IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| In re: | Case No. 24-14573-SMG |
| AARON DURALL, | Chapter 11 |
| Debtor. | Subchapter V |

**CIGNA HEALTHCARE OF GEORGIA INC.'S
OBJECTION TO DEBTOR'S SUBCHAPTER V ELECTION OR, IN THE
ALTERNATIVE, MOTION TO CONVERT TO CHAPTER 7**

Cigna Healthcare of Georgia Inc. ("Cigna"), creditor in this proceeding, files this Objection to Debtor's subchapter V election (the "Objection") and respectfully requests that this Court order the Debtor to strike his subchapter V election or, in the alternative either compel him to refile his petition under chapter 11 without a subchapter V election or convert this case to chapter 7. Cigna respectfully states as follows:

**INTRODUCTION**

Debtor Aaron Durall ("Mr. Durall") inappropriately filed this case under subchapter V of chapter 11. He is not an eligible "debtor" under 11 U.S.C. § 1182 and therefore cannot proceed under subchapter V.

*First*, his noncontingent, liquidated debts exceed $7.5 million 11 U.S.C. § 1182(1)(a). Cigna holds a final, confirmed arbitration award against Mr. Durall's company, DL Investment Holdings, LLC ("DL Investment") in the amount of $20,667,019 for breach of contract, violations of ERISA, fraud, negligent misrepresentation, and conversion.[1] Cigna filed a civil action against

---

[1]     Cigna believes that Mr. Durall's accomplice, Neisha Zaffuto, in fact owns 50% of DL Investment, though no piece of paper reflected her ownership stake. Ms. Zaffuto's role, and her connections to Mr. Durall and this bankruptcy, are described further below.

1

Mr. Durall and his accomplice, Ms. Zaffuto (which has been stayed as to Mr. Durall because of the filing of this bankruptcy) asserting that they are liable as alter egos of DL Investment. While Mr. Durall may be entitled to *dispute* his liability, the debt itself is neither contingent nor unliquidated.[2]  Therefore, he is ineligible for relief under subchapter V.

*Second*, in his own filings, Mr. Durall admits that his debts are primarily consumer debts. To be an eligible subchapter V debtor, a person must show that "not less than 50 percent of [his debts] arose from the commercial or business activities of the debtor." 11 U.S.C. § 1182(1)(a). Mr. Durall's admission is inconsistent with this requirement and therefore he is ineligible under subchapter V for this additional and independent reason.  At his section 341 meeting of creditors, he acknowledged that he has not been engaged in business for years, which further supports this Objection.[3]

*Third*, Mr. Durall must show that he is "a person engaged in commercial or business activities."  However, he admits that his debts are primarily consumer debts, and he also reports no business income or expense, no business-related financial statements, and no business assets or liabilities. He is not "a person engaged in commercial or business activities."

The question naturally arises: why?  Why has Mr. Durall – clearly not an eligible subchapter V debtor – filed a subchapter V case?  Cigna believes that it is his only path to avoid the scrutiny that bankruptcy ordinarily provides through a chapter 11 creditors' committee or a

---

[2]     Mr. Durall scheduled Cigna as holding a claim that is disputed, contingent, and unliquidated. Schedule E/F, D.E. 1. While Mr. Durall may dispute the claim, it is neither contingent nor unliquidated.

[3]     A true and correct copy of Mr. Durall's testimony at his section 341 meeting held on June 5, 2024 is attached hereto as **Exhibit A**.  In addition to making statements relevant to this Objection, he admitted to withholding and/or transferring millions of dollars to related parties, specifically his wife and father, prior to filing for bankruptcy.  Those admissions include transfers of $690,000 to his wife from the sale of a Ferrari seventy days before filing for bankruptcy.  Cigna believes these admitted transfers for no or inadequate consideration barely scratch the surface of Mr. Durall's conduct. Contemporaneous herewith, Cigna is also seeking relief under Bankruptcy Rule 2004.

chapter 7 trustee, while avoiding paying Cigna debt without a wholesale liquidation of his assets (under chapter 7) or through a chapter 11 plan process that would require Cigna's affirmative vote.

The schedules and SOFAs that Mr. Durall filed, as well as his testimony at the section 341 meeting, make clear why he is trying to avoid this scrutiny. He is hiding assets with his wife and family and misstating the true scope and extend of his assets. For instance, he has an unencumbered $3.5 million house in Parkland, Florida. *See* Schedule A/B, D.E. 1. He also schedules a "Piquet Royal Oak" watch, described on the *Luxury Bazaar* website as a "hype watch" which is "highly sought-after, ultra-valuable, and instantly recognizable."[4] When questioned about this watch, he testified that he incorrectly listed this watch, that he no longer had the watch, and that the watch he has is, instead, a Patek Phillipe. *See* Exhibit A at 58-59.

He also estimates $1,000/month he claims to pay for auto insurance, despite scheduling no owned or leased cars. *See* Schedule J, D.E. 1, *c.f.* Schedule A/B, D.E. The asserted insurance expense may be related to three high-end cars his wife purchased in her own name with his money. *See* Exhibit A at 58 (identifying a Range Rover, Range Rover Sport, and a Mercedes Benz S580 purchased in 2020, 2021, and 2023 respectively). It does ***not*** appear to be related to the Ferrari Spider he sold for $690,000 on February 29, 2024 – 70 days before filing for bankruptcy – despite reporting *no* cash in his financial filings. *See* SOFA, D.E. 1, *c.f.* Schedule A/B, D.E. 1. At his 341 meeting, he testified that he transferred that money to his wife for no consideration. *See* Exhibit A at 26.

These oddities just start to scratch the surface of Mr. Durall's true financial circumstances and transfers. As such, contemporaneous herewith, Cigna is pursuing examinations under Rule

---

[4]     *Buying Guide: How Much Does An Audemars Piguet Royal Oak Cost?*, Luxury Bazaar (April 10, 2024) https://www.luxurybazaar.com/grey-market/how-much-does-an-audemars-piguet-royal-oak-cost/.

2004 to discover the full scope of Mr. Durall's financial dealings, assets, and other transfers. Regardless, Mr. Durall is ineligible under subchapter V of chapter 11. Therefore, Cigna requests that this Court compel Mr. Durall to amend his petition promptly and not designate this case under subchapter V or, alternatively, convert this case to chapter 7.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This Motion is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I) and this Court has authority to enter a final order or judgment on this matter.

2.     The statutory and legal predicates for the Objection are Sections 1112(b) and 1182 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 1017 and1020, and Bankruptcy Local Rule for the Southern District of Florida Bankruptcy Court 1017-1(B).

## FACTUAL BACKGROUND

### *Mr. Durall's Fraudulent Scheme Run Through DL Investment*

3.     Mr. Durall and Ms. Zaffuto defrauded Cigna (and others) through a urine testing services overbilling scheme operated through an entity known as DL Investment. They purchased a small rural hospital (through DL Investment, which they own and control) and began to submit large numbers of fraudulent health insurance claims for urine drug testing services at favorable in-network reimbursement rates, even though those alleged services were actually performed at a different location by a different entity they also owned and operated (which was out-of-network).

4.     The roots of this scheme began in 2014, when Mr. Durall and Ms. Zaffuto opened a drug testing laboratory, Reliance Laboratory Testing, Inc. ("Reliance"). Reliance performed urine drug testing services, primarily for patients in drug and alcohol treatment centers around the country and billed private health insurers for reimbursement as an out-of-network provider.

5.      In August 2016, they purchased Chestatee Regional Hospital for $15 million, with each allegedly contributing $7.5 million. Mr. Durall paid his half through DL Investment, which subsequently began doing business as Chestatee. Despite each party funding half of the purchase price, they never executed a written contract indicating their ownership interests.  On paper, DL Investment owned 100% of the hospital and Mr. Durall owned the equity in DL Investment.  In reality, Ms. Zaffuto owned 50% of Chestatee.  Because Chestatee was merely a d/b/a of DL Investment, as a practical matter Ms. Zaffuto owned 50% of DL Investment, though no piece of paper reflects her ownership stake.

6.      Chestatee was a rural hospital that was in-network with Cigna and had favorable in-network reimbursement rates.

7.      After acquiring Chestatee, they caused it to submit large numbers of claims for urine drug testing services, which included urine drug screens and urine drug confirmatory tests. They intentionally misrepresented that the urine drug screens were performed at Chestatee (when, in fact, many had been performed at Reliance) to take advantage of the rural hospital's favorable in-network reimbursement rates. This scheme allowed them to benefit from the (out-of-network) volume created at Reliance while being compensated at the (in-network) rate at Chestatee. Moreover, they intentionally misrepresented that urine drug confirmatory tests were performed at Chestatee when, in fact, Chestatee could not have performed urine drug confirmatory tests, since it didn't even own the necessary equipment to run those tests.  Thus, this scheme allowed them to benefit by getting paid for urine drug confirmatory tests that were never run at Chestatee.

8.      Through this scheme, they began to make substantial amounts of money from private health insurers, such as Cigna, that unwittingly reimbursed for the urine drug tests.  They

directed money from reimbursements for the urine drug tests to accounts based in Florida belonging to DL Investment, rather than the hospital's operating accounts.

9.     Mr. Durall appears to have used the money flowing into DL Investment's accounts for his own personal use and to pay Ms. Zaffuto. Cigna believes that the proceeds from this scheme (extracted from Cigna and others) include payments to Mr. Durall of at least $184,407,671.87 (as well as at least $10,902,011.30 to Ms. Zaffuto).[5]

10.     Based on information currently available to Cigna, DL Investment acted merely as a pass-through vehicle for Mr. Durall's and Ms. Zaffuto's ownership of Chestatee to receive the monies from their insurance reimbursement fraud.

---

[5]     Based on information currently available to Cigna, the proceeds from this fraud include assets reflected on Mr. Durall's schedules and SOFAs, as well as assets that are not referenced on either the schedules or SOFAs.  Proceeds that **are** referenced in the schedules and SOFAs include the following:

- The real property located at 7822 Marvana Lane, Parkland, Florida, 33076, (Listed in Schedule A/B for $3.5 million);
- The 2015 Ferrari 458 Speciale Spider, the 2017 Range Rover, and the 2015 Mercedes Benz S550 listed on Mr. Durall's Statement of Financial Affairs Question 18; and
- the Audemars Piguet Royal Oak Lady Offshore women's watch and the Tiffany & Company diamond 3.280 carat solitaire ring both listed on Mr. Durall's Schedule A/B.

Assets **not** listed on the schedules or SOFAs, but which Cigna believes are a result of the scheme described in this Motion include:

- Real property located at 9447 Satinleaf Place, Parkland, Florida, 33076, estimated to be worth approximately $1.2 million (which Mr. Durall testified he quitclaimed to his father); and
- A Patek Philippe 5940G-010 men's watch.

The assets not listed in his bankruptcy schedules were listed in a federal indictment against Mr. Durall. *See United States v. Perez, et al.*, Case No. 20-cr-00086-TJC (M.D. Fla. Oct. 7, 2020) D.E. 180 at 31-38. Mr. Durall was indicted and then acquitted of federal criminal charges of conspiracy, healthcare fraud, conspiracy to commit money laundering, and money laundering by the District Court for the Middle District of Florida in the case styled *United States v. Perez, et al.*, Case No. 20-00086. *See id.* D.E. 180 (superseding indictment).

In this criminal case's first trial, two of Mr. Durall's alleged co-conspirators were convicted, but the jury hung as to Mr. Durall. In the second trial, Mr. Durall's co-defendants testified about his involvement in the criminal conduct. The jury reported that it was deadlocked on a verdict. Only after the judge issued an "Allen charge" did the jury return a not-guilty verdict as to Mr. Durall. Five of Mr. Durall's criminal co-defendants were convicted or pleaded guilty and one fled the country. *Id.* at D.E. 143–51, 619, 768-75, 977-80, 1005, 1007.

11.    Before discovering the fraud scheme, Cigna reimbursed Chestatee almost $13 million solely for urine drug screens and urine drug confirmatory tests, based on the fraudulent representation that those services had been performed at Chestatee (when, in fact, they had been performed at Reliance).

12.    In April 2018, DL Investment sold Chestatee. Prior to the sale, DL Investment made more than $130 million from reimbursement from urine drug testing alone. Due to Mr. Durall's and Ms. Zaffuto's misappropriation of assets from a rural hospital, Chestatee was forced to close shortly after the sale resulting in approximately 200 layoffs.[6] On information and belief, DL Investment currently has no assets.

### The Arbitration, Award and Confirmation

13.    The then-operative in-network contract between Chestatee and Cigna contained an arbitration clause, requiring disputes to be arbitrated under the rules of the American Health Law Association Alternative Dispute Resolution Service.

14.    On February 28, 2022, DL Investment served an arbitration demand on Cigna, asserting claims for breach of contract, violation of the Georgia Prompt Pay Act, unjust enrichment, and breach of the covenant of good faith and fair dealing, demanding reimbursement for allegedly unpaid claims for urine drug testing.

15.    Cigna timely answered on April 25, 2022, asserting counterclaims against DL Investment for breach of contract, violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), fraud, negligent misrepresentation, unjust enrichment, and conversion.

16.    An arbitration hearing was conducted on August 23-26, August 28-30, in person in Atlanta, Georgia, and on September 15 and September 19, 2023, via Zoom. The hearing was held

---

[6] *See* https://www.wabe.org/chestatee-regional-hospital-may-get-new-owners-temporarily-close/.

in front of arbitrator Christine Whitney (the "Arbitrator") under the rules of the American Health

Law Association. Mr. Durall, Ms. Zaffuto, and an expert witness testified for DL Investment. Two

Cigna employees, a former Chestatee employee, and an expert witness testified for Cigna.

17.     On September 29, 2023, the parties submitted draft findings of fact and conclusions

of law. The Arbitrator issued the award on December 1, 2023, attached hereto as **Exhibit B** (the

"Award"). The Award denied all of DL Investment's claims and granted all of Cigna's

counterclaims. The Award also awarded Cigna with all pre- and post-judgment interest, attorneys'

fees and costs, and costs of the arbitration.

18.     The Arbitrator awarded Cigna a total of $20,667,019: $61,900 in Arbitrator

compensation and expenses, $1,711,994 in attorney's fees and costs, and $18,893,125 in restitution

and prejudgment interest.[7]

19.     On December 21, 2024, Cigna filed a petition to confirm the Award against DL

Investment in the United States District Court for the Southern District of Florida (the "District

Court") in the case styled *Cigna Healthcare of Georgia, Inc. v. DL Investment Holdings, LLC et

al.*, Case No. 23-62393 (S.D. Fla. Dec. 21, 2023) D.E. 1.  In the same action, Cigna named Mr.

Durall and Ms. Zaffuto as defendants, seeking to hold them liable for the Award under alter ego

theories.  A copy of the petition is attached hereto as **Exhibit C**.

---

[7]     Mr. Durall scheduled Cigna as holding a claim of $20 million.  While this amount is less than
a 4% difference from the true amount of the Award (and the difference itself is immaterial to this
Objection), Cigna submits that it is indicative of the cavalier manner with which Mr. Durall has
approached this bankruptcy case to date.  That difference (more than $650,000) is *far* more than most
individual debtors report in *total* liabilities in their bankruptcy cases.  *See* Bankruptcy Abuse and
Prevention Act Statistics and Reports during the 12 month period ending December 31, 2023, Table
1X (*available at* https://www.uscourts.gov/sites/default/files/data_tables/bapcpa_1x_1231.2023.pdf)
(reporting total liabilities of approximately $65.6 billion in 425,413 individual debtor cases filed in the
United States in 2023, which equates to average liabilities of approximately $154,000).

20.    The District Court confirmed the Award by an Order entered on May 24, 2024, attached hereto as **Exhibit D**.  *Cigna Healthcare of Georgia, Inc. v. Dl Investment Holdings, LLC et al.*, Case No. 23-62393 (S.D. Fla. May 24, 2024) D.E. 45.  In its order, the District Court determined that it "must grant" Cigna's petition to confirm the Award because none of the narrow exceptions to confirmation in Section 10 of the FAA applied.  *Id*. at 10.

### *The Alter Ego Actions Against Mr. Durall and Ms. Zaffuto and Durall Bankruptcy*

21.    The petition to confirm the Award includes a complaint against Mr. Durall and Ms. Zaffuto to hold them individually liable for the Award as alter egos of DL Investments.  As to Mr. Durall, the complaint alleged that during the operative period (between 2016 when DL Investment bought Chestatee and 2018 when it sold Chestatee), he was, on paper, the sole owner, manager, and member of DL investment.  In reality, he and Ms. Zaffuto split the proceeds of DL Investment 50/50. In such capacity, Mr. Durall used and abused DL Investment's corporate form to achieve his own ends.  At the time DL Investment owned Chestatee, DL Investment and Chestatee were one and the same.  There was no separate existence between DL Investment and Mr. Durall and Ms. Zaffuto.  DL Investment was a mere instrumentality of Mr. Durall and Ms. Zaffuto. They disregarded the corporate formalities of DL Investment and Chestatee by actively dominating the companies and using them for an improper purpose, including withdrawing more than $130 million from Chestatee while causing DL Investment to operate a fraudulent scheme seeking reimbursement from urine drug testing.

22.    On May 9, 2024, Mr. Durall filed his Chapter 11 petition electing treatment under Subchapter V (the "Petition"). D.E. 1.

23.    On May 15, 2024, the District Court entered an order staying the proceeding against Mr. Durall as a result of his commencing this bankruptcy case.  *Cigna Healthcare of Georgia, Inc.*

*v. Dl Investment Holdings, LLC et al.*, Case No. 23-62393 (S.D. Fla. May 15, 2024) D.E. 45.  The civil action continues and has not been stayed as to any other defendant.

### *Mr. Durall's Petition, Schedules, SOFAs, and Section 341 Meeting*

24.     In his Petition, Mr. Durall states that his debts are primarily consumer debts.  D.E. 1 at 6, 11, and 35.

25.     He lists the Award as both contingent and unliquidated.  Schedule E/F, D.E. 1.

26.     He does not identify any business assets or liabilities on Schedule A/B. Nor does he identify any executory contracts related to any alleged business activities in Schedule G. He reports no business income or expense on Schedules I and J.  Indeed, he reports no income at all. He also admits that he has no cash flow statements, no balance, sheets, and no statements of operations. D.E. 17.

27.     At his section 341 meeting, in addition to disclosing millions of dollars he transferred for no apparent consideration, Mr. Durall also explained that he has no interest in any business that is currently operating or has any assets. *See* Exhibit A at 7, 23-25, 45-46.

28.     Mr. Durall has not worked in years. *Id.* at 7. His wife, Melanie Durall, whose millions of dollars of savings Mr. Durall purports to live off, has not worked in 18 years – and she got all of "her" money directly from him. *Id.* at 8-9, 12, 37.

29.     He has not formulated a plan to emerge from bankruptcy, but intends to use this proceeding to shed his debts, which he has stated are primarily consumer debts. *See* Exhibit A at 33; D.E. 1 at 6, 11, and 35.  He hopes to restart a law practice after he is readmitted to active practice in the Florida bar.  *Id*. at 8, 20. However, he has not practiced for eight years, none of the debts he seeks to address in this case are related to his former law practice, and he has not yet taken steps to restart his law practice. *Id*. at 7.

30.     In Schedule J, Mr. Durall includes a $1,000 monthly car insurance expense though his Schedule A/B states that he has no vehicles. *See* Schedule J, D.E. 1, *c.f.* Schedule A/B, D.E. 1. He testified at his 341 meeting that, while he does not have any vehicles, his wife purchased three cars in the last 4 years including two Range Rovers and a Mercedes. *See* Exhibit A at 34.  It appears that this payment may be related to auto insurance Mr. Durall claims he needs to pay for cars titled in his wife's name, paid for with money transferred to her by Mr. Durall, but for which he claims no interest in his schedules.

31.     This money does ***not*** appear to be related to the Ferrari Spider that Mr. Durall previously owned.  He claims to have sold that car for $690,000 on February 29, 2024 – 70 days before filing for bankruptcy – despite reporting no cash in his financial filings.  *See* SOFA, D.E. 1, *c.f.* Schedule A/B, D.E. 1. He testified at his 341 meeting that he wired those proceeds to his wife, who continues to hold those amounts.  *See* Exhibit A at 26-27.  His asserts that she holds these amounts because he is unable to open a bank account, though he admits that he has a DIP bank account.  *Compare id.* at 26:25 *with id.* at 22:10-14.  As of the 341 meeting, the DIP account had a zero balance. *See id.* at 22.

32.     He testified at his 341 meeting that he lives off of the interest of millions of dollars that he transferred to his wife in 2016 and 2017. *See id.* at 49; 9. He cannot not identify how much money his wife had in her accounts, though he has access to the bank statements.  *See id.* at 49-50, 53-54.

33.     Mr. Durall also listed a "Piquet Royal Oak Watch" on his Petition (D.E. 1, Schedule A/B).  When questioned at his 341 meeting, he admitted that he no longer had the watch and should have listed a Patek Philippe watch instead.[8]  *See id.* at 58.

---

[8]     It is possible that Mr. Durall's Petition was referring to the Audemars Piguet Royal Oak Lady Offshore women's watch and the Patek Philippe 5940G-010 men's watch as listed in the recovered

34.     He also testified that he transferred real property located at 9447 Satinleaf Place, Parkland, Florida, 33076 by quitclaim deed to his father, thereby allegedly renouncing all ownership interest. *See id*. at 13.   He estimated that the house is worth approximately $1 million. *Id*. at 56.

## I.     <u>MR. DURALL IS NOT AN ELIGIBLE SUBCHAPTER V DEBTOR</u>

35.     While Mr. Durall elected to file under subchapter V, that election is not dispositive. If a party in interest timely objects to the subchapter V election, it is the debtor's burden to establish eligibility.  *In re Vertical Mac Constr.*, LLC, No. 6:21-bk-01520-LVV, 2021 Bankr. LEXIS 2285, at *4 (Bankr. M.D. Fla. July 23, 2021).   An objection is timely if it is made within 30 days after the conclusion of the meeting of creditors under section 341(a). *See* FED. R. BANKR. P. 1020(b). The section 341(a) meeting of creditors concluded on June 5, 2024.  This Objection is therefore timely and Mr. Durall bears the burden to establish his eligibility under subchapter V.

36.     To be an eligible filer under subchapter V of chapter 11, a debtor must be: (1) a "person"; (2) who is "engaged in business or commercial activities," (3) whose "aggregate noncontingent liquidated secured and unsecured debts" as of the petition date must not exceed $7,500,000; (4) "not less than 50 percent of which arose from" the debtor's business or commercial activities. 11 U.S.C. § 1182(1)(A).

37.     Bankruptcy courts may look to any probative evidence to assess subchapter V eligibility; the court is not restricted to the schedules (or other information provided by the debtor) alone.   "While the schedules offer some probative value, the Court will not restrict its inquiry

---

assets in his indictment. *See United States v. Perez, et al.*, Case No. 20-00086, (M.D. Fla. Oct. 7, 2020) D.E. 180, pp. 31-38.  He claims to have no paperwork related to these watches, could not identify the amounts for which they were purchased, and claims to have valued them by "looking online." *See* Exhibit A at 55-56.

solely to the schedules." *In re Hall*, 650 B.R. 595, 600 (Bankr. M.D. Fla. 2023). Information

regarding eligibility provided by creditors is also probative. *See In re United Safety & Alarms,*

*Inc.*, No. 23-14861-SMG, 2024 Bankr. LEXIS 540, at *7 n.43 (Bankr. S.D. Fla. Mar. 6, 2024); *see*

*also In re Heart Heating & Cooling, LLC*, No. BR 23-13019 TBM, 2024 WL 1228370, at *10

(Bankr. D. Colo. Mar. 21, 2024) (holding that subchapter V eligibility determination requires

review of both schedules and timely filed proofs of claim).

**A.      Mr. Durall's Noncontingent Liquidated Debts Exceed $7,500,000.**

38.      Cigna's claim alone is sufficient to render Mr. Durall ineligible for subchapter V.

Cigna's claim exceeds $20 million, and is noncontingent and liquidated.

### *i.      Cigna's Alter Ego Claim Against Mr. Durall is Noncontingent.*

39.      All events giving rise to Cigna's alter ego claim against Mr. Durall occurred prior

to Mr. Durall filing the Petition. Cigna's claim is therefore noncontingent.

40.      A claim is noncontingent on the petition date when the events giving rise to the

claim have already occurred prepetition. *In re Farber*, 355 B.R. 362, 371 (Bankr. S.D. Fla. 2006)

("[A] debt is non-contingent as long as the events that give rise to it occurred prior to the

petition."). The *Farber* case is instructive. In *Farber*, the issue was the debtors' eligibility to file

under chapter 13. The debtors had two debts that were reduced to judgments. *Id*. at 370. The

failed to include accrued and unpaid interest on those debts to avoid the applicable chapter 13 debt

limit. *Id*. They also failed to identify a $948,000 claim against them that was the subject of a then-

pending breach of contract action in state court. *Id*. The court found that that debt was

noncontingent (and also unliquidated). *Id*. So long as the events that give rise to the alleged claim

occurred prior to the petition, then the claim is non-contingent, even if those events have not given

rise to a judgment. *Id*.

41.     A claim to pierce the corporate veil and impose debt owed by a corporation on a shareholder under an alter ego theory arises once the corporation is found liable for that debt. Bankruptcy courts within the Eleventh Circuit have held that once a judgment is entered against a company, an alter ego claim becomes noncontingent as to the principal. *Anglin v. Estes (In re Estes*), 415 B.R. 568, 578-79 (Bankr. N.D. Ala. 2009). In *Estes*, the plaintiffs filed civil actions against the corporation, the debtor filed a bankruptcy case while the civil actions remained pending, then the plaintiffs obtained their judgments against the corporation and thereafter obtained their corporate veil judgment against the debtor. *Id.* at 576. The court explained that "the debtor's potential, personal liability for [the corporation's] debts [under an alter ego theory] did not come into being until the plaintiffs reduced [their claims] to judgments against the corporation. At that point, but not before, they acquired a cause of action to pierce the corporate veil." *Id.* at 578. A veil piercing claim to collect on a corporate debt is no longer contingent when both the corporation is found liable for the debt and a principal's malfeasance occurred prepetition.

42.     In this situation, Cigna's claim was fixed upon the date of entry of the Award. Arbitration awards are final and binding. In *Celotex Corp.*, the bankruptcy court afforded an arbitration award (not submitted for confirmation) issue preclusive effect. *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 196 B.R. 602, 608 (Bankr. M.D. Fla. 1996). Discussing the arbitration confirmation process, the *Celotex* court explained "[c]onfirmation of an arbitration award does not examine the underlying arbitration process, but is available simply upon the appropriate request of a party where the parties agreed to allow a judgment based on the award." *Id.* at 605. "In accordance with the Eleventh Circuit's criteria, this Court finds it appropriate to apply the doctrine of issue preclusion to the arbitral decision in the instant case. No federal claim

is implicated here, only a determination of the parties' rights under a contract of insurance." The same issue preclusive effect of an unconfirmed arbitration award has been found in other circuits.[9]

43.     Here, as in *Farber*, Cigna's claim is non-contingent, even though Cigna did not reduce its claim against Mr. Durall to judgment prior to the petition date (though it had obtained the Award against DL Investment).  The facts that give rise to Mr. Durall's liability occurred between 2016 and 2018, while he controlled DL Investments and abused its corporate form to cause DL Investments to defraud Cigna.  All facts relevant to an assessment of Mr. Durall's liability arose and accrued years prior to the commencement of his bankruptcy case.  Though the dispute between DL Investment and Cigna proceeded in arbitration rather than litigation like *Estes*, the legal analysis remains applicable. As held in *Estes*, Mr. Durall's personal liability under an alter ego theory accrued once liability was determined as to DL Investment upon entry of the Award.

44.     That Award was the result of 9 days of arbitration hearings, 7 of which were in-person, and 2 over Zoom; testimony from Mr. Durall, Ms. Zaffuto, two Cigna employees, a former Chestatee employee, and multiple expert witnesses; and parties' draft findings of fact and conclusions of law.

45.     Entry of the Award against DL Investments caused the alter ego claim to accrue against Mr. Durall for collection on DL Investment's debt. As such, all events giving rise to the

---

[9]     A Southern District of New York bankruptcy court applied the doctrine of *res judicata* to a final arbitration award to preclude a debtor from later challenging the claim amount, even when that final award was issued post-petition. *In re MarketXT Holdings Corp.*, No. 04-12078 (ALG), 2009 Bankr. LEXIS 1897, at *19 (Bankr. S.D.N.Y. July 20, 2009). Further, the Second Circuit, applying New York law, does not require an arbitration award to be confirmed for preclusive effect. *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 264, 266-67 (2d Cir. 1997).

alter ego claim against Mr. Durall occurred prepetition. Therefore. Cigna's claim against Mr. Durall is non-contingent.

### ii.        Cigna's Alter Ego Claim Against Mr. Durall is Liquidated.

46.     Cigna's alter ego claim against Mr. Durall is liquidated, even if Mr. Durall attempts to dispute his liability.  Generally, a claim is liquidated when "its amount is readily and precisely determinable."  *United States v. May*, 211 B.R. 991, 996 (M.D. Fla. 1997).  Ordinarily, claims of a contractual nature are subject to ready determination and precision in computation on the amount due and are therefore deemed to be liquidated.  *In re Hall*, 650 B.R. at 599.  In contrast, tort claims are generally not deemed to be liquidated until reduced to judgment.  *Id*.  It is the nature of the process for determining the claim, not the magnitude of the dispute that determines whether a claim is liquidated or unliquidated.  *Id*. (*citing Nicholes v. Johnny Appleseed (In re Nicholes)*, 184 B.R. 82, 91 (B.A.P. 9th Cir. 1995) ("So long as a debt is subject to ready determination and precision in computation of the amount due, then it is considered liquidated and included for eligibility purposes under § 109(e), regardless of any dispute.").

47.     Cigna's claim is "subject to ready determination and precision in computation" even though it arises from Mr. Durall's fraud, not a contractual obligation.  First and foremost is the Award, which itself is a liquidated claim.  Indeed, Mr. Durall acknowledges the liquidated nature of the claim in his schedules by scheduling it in a liquidated amount (even though he identifies it as unliquidated and incorrectly states the amount of the debt).  *See* Schedules E/F, D.E. 1.

48.     Second, there is the nature of the alter ego doctrine itself.  It is, in essence, an equitable remedy available, in appropriate circumstances, to hold a principal liable for the obligations of a corporation.  Upon the requisite showing by a creditor to pierce the corporate veil,

the principal becomes individually liable for the debts of the corporation itself. *See, e.g., Biscayne Realty Ins. Co. v. Ostend Realty Co.*, 109 Fla. 1, 18 (Fla. 1933) ("If the stockholders of a corporation enter into a transaction in their individual and private interests, and utilize the name of the corporation merely as a convenience for the completion of the transaction, where the legal entity as such has no interest in the matter but the name is used to mislead creditors or perpetrate a fraud upon them, *the legal entity in the name of which the transaction was carried will be ignored and the parties held to individual liability*.") (emphasis added). In other words, if Mr. Durall is determined to be the legal alter ego of DL Investment, he will be liable for the entirety of the Award. Mr. Durall may attempt to dispute *whether* he is liable for DL Investments' debts. But, if he is liable, the amount he owes Cigna will not be in dispute. It will be the entirety of the Award. That is, Cigna's claim is subject to ready determination and precision in computation of the amount and is therefore liquidated.

**B.      Mr. Durall Is Ineligible Because 50% or More of His Debts Do Not Arise for Commercial or Business Activities.**

49.      Mr. Durall is also ineligible to proceed under subchapter V because he cannot demonstrate that 50% or more of his noncontingent liquidated debts arose from his commercial or business activities. He has admitted that his debts are "primarily consumer debts" and are not "primarily business debts." *See* Petition § 16, D.E. 1.

50.      In addition to his admissions, he schedules a total of five claims, all of which are unsecured.[10] Those scheduled debts total approximately $20.5 million. Thus, Cigna's scheduled claim represents in excess of 97% of his total scheduled, thus-far-reported debts. Even if Mr.

---

[10]      While not directly relevant to this Objection, it is notable that Mr. Durall identifies *no* secured creditors, but lists a $3.5 million residence he claims to own on an unencumbered basis.

Durall were to attempt to amend his petition to change his admission, such amendment would be inappropriate given the nature of Cigna's debt alone.

51.    That debt, as detailed in the Award, arises from his liability for DL Investment's fraud.  While the judgment is against DL Investment, Mr. Durall's liability is derivative of DL Investment's liability.  Courts consistently recognize that tortious claims for fraud are not business debts. *See In re West.*, No. 16-04083-can, 2017 Bankr. LEXIS 527, at \*27 (Bankr. W.D. Mo. Feb. 24, 2017) ("[A] debt arising from an intentional tort is not a consumer or a business debt; a debtor does not ordinarily commit an intentional tort for either a personal or business purpose"); *In re Peterson*, 524 B.R. 808 (Bankr. S.D. Ind. 2015) (an intentional tort judgment is an interstitial debt, not a consumer debt or a business debt); *Andrews v. Indirect Purchaser Class (In re Andrews)*, No. 18-3070-dof, 2019 Bankr. LEXIS 2219, at \*15 (Bankr. E.D. Mich. July 23, 2019); *see also* Official Form 101, Part 6 (stating that "Business Debts are debts that you incurred to obtain money for a business or investment or through the operation of the business investment").

52.    Mr. Durall's liability to Cigna is not a business debt and did not arise from commercial or business activities.  As such, in addition to Mr. Durall's own admission in his Petition, it would be futile for him to attempt to amend his petition to assert that his debts are primarily business debts because he cannot make that showing with respect to the debt he owes Cigna, which accounts for in excess of 97% of his total scheduled debts.

**C.    Mr. Durall Is Ineligible Because He Is Not Engaged in Business Activities.**

53.    There is no evidence in the Petition or schedules that Mr. Durall is engaged in business activities. Thus, he is also ineligible for subchapter V relief for this additional reason.  *See* 11 U.S.C. § 1182.

54.     Most courts have held that a debtor must at least be currently or presently engaged in commercial or business activities to meet the definition of a debtor under section 1182(1)(A), although a debtor does not need to be "actively operating" at the time of its subchapter V election. *See In re Blue*, 630 B.R. 179 (Bankr. M.D. N.C. 2021) (noting that the subchapter V debtor must be "presently engaged in commercial or business activities"); *In re Offer Space, LLC*, 629 B.R. 299, 305-06 (Bankr. D. Utah 2021) (requiring that a subchapter V debtor be "currently," not formerly, engaged in business); *In re Ikalowych*, 629 B.R. 261 (Bankr. D. Colo. 2021) (holding that "currently engaged" in commercial or business activities encompasses time periods "immediately preceding and subsequent to the Petition Date"); *In re Vertical Mac*, 2021 Bankr. LEXIS 2285, at *3-4 (holding that a debtor that had no operations at the time of filing but did maintain business activities such as maintaining bank accounts, dealing with insurance issues and claims, and sought to sell its business in subchapter V constituted commercial or business activities qualified it for subchapter V).  Other courts have found that a debtor who is not currently engaged in business activities can still be eligible for subchapter V when the debtor had business assets or liabilities that it sought to wind-up through bankruptcy. *See In re Vertical Mac*, 2021 Bankr. LEXIS 2285; *In re Offer Space*, 629 B.R. 299; *In re Wright*, 20-01035-HB, 2020 Bankr. LEXIS 1240, at *8 (Bankr. D.S.C. Apr. 27, 2020) (holding that the debtor was engaged in commercial or business activities by addressing residual business debt).

55.     None of these situations apply to Mr. Durall.  While he owns a number of business entities, none of these entities are operating, none have assets, and none generate income. *See* Exhibit A at 42-46. Nor are any of these entities a debtor in bankruptcy.  Mr. Durall testified that he is not currently engaged in any business activities. *Id*. at 7-8. Nor is he using this bankruptcy to

attempt to resolve any business-related debts.  *See* Petition § 16, D.E. 1.  Thus he is ineligible for subchapter V for this third, independent reason.

## II.  ALTERNATIVELY, CONVERTING MR. DURALL'S CASE TO CHAPTER 7 IS IN THE BEST INTEREST OF CREDITORS

56.     For now, Cigna is not challenging Mr. Durall's decision to file for bankruptcy or his choice to file under chapter 11.  It is only challenging his election to proceed under subchapter V, because he is ineligible.  If he does not promptly amend his Petition – *i.e.*, within days of the adjudication of this Objection – Cigna requests that his case be converted to chapter 7.

57.     Under section 1112(b) of the Bankruptcy Code, a court may convert a chapter 11 case to chapter 7 "for cause" upon the request of a party in interest. 11 U.S.C. § 1112(b). If the court finds "cause," the court must determine whether conversion is in the best interests of the creditors and the estate. *In re Sundale, Ltd.*, 471 B.R. 300, 302 (Bankr. S.D. Fla. 2012) (finding cause to convert chapter 11 reorganized debtors' cases to cases under chapter 7 based upon material default under substantially consummated plan). Section 1112(b) provides a nonexclusive list of grounds for conversion including the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).

58.     Cause for conversion exists under 11 U.S.C. § 1112(b) when a subchapter V debtor's principal is in a conflicted position as to necessary investigations of fraud. *In re No Rust Rebar, Inc.*, 641 B.R. 412, 414 (Bankr. S.D. Fla. 2022) (converting subchapter V case to chapter 7 also noting that conversion was warranted for clear discrepancies in debtor's schedules regarding existence of assets and claims).

59.     Conversion under section 1112(b)(4)(A) is also warranted when a debtor is suffering continued losses, failing to make a profit, and not paying its bills as they become due.

*See In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986); *see also* 7 COLLIER ON BANKRUPTCY § 1112.04[6][a] (16th ed. 2017).

60.     Conversion is in the best interests of creditors for reasons already clear from the section 341 meeting, the Schedules and the SOFAs. *Since* commencing this case, Mr. Durall has not been acting as a fiduciary of his estate or his creditors. Shortly before filing this bankruptcy, he sold a Ferrari for $690,000 and put those proceeds in his wife's account. He acknowledges that the proceeds from the sale are his, but claims that he deposited the proceeds into his wife's account because he did not have a bank account of his own. *See* Exhibit A at 26. However, *since* filing for bankruptcy, he testified that he does have DIP account, albeit one with a zero balance. *Id.* at 22. He also admits that he was previously instructed to secure that property, but as of the time of the section 341 meeting, he had taken no such steps to do so and, indeed, had not even discussed doing so with his attorney. *Id.* at 26-28. In other words, whatever pretext existed shortly before bankruptcy for transferring $690,000 to his wife from the sale of a Ferrari does not exist now. Despite being instructed to secure this property for the benefit of this proceeding, as of June 5, 2024, he has taken no apparent steps to do so. If Mr. Durall wants the protection and benefit of chapter 11, he is obliged to act as a trustee and fiduciary for his estate and its creditors. *See* 11 U.S.C. § 1182. He has not done this.[11]

61.     Mr. Durall is also conflicted in his ability to investigate and, where appropriate, pursue legitimate causes of action to recover assets that may belong to his estate. In the section 341 meeting, he admitted transferring millions of dollars to relatives, including quitclaiming a

---

[11]     In addition to failing to secure the $690,000 in proceeds from the sale of the Ferrari, Mr. Durall has failed at other basic tasks required of a debtor in possession. For instance, he has failed to comply with his section 1116(1) filing requirements. He has also failed to comply with his filing requirements under Bankruptcy Rule 2015.3, which is relevant to multiple companies he identifies in his Schedules.

house to his father and transferring an unstated amount of money to his wife, which he acknowledges is more than $1 million.  *See* Exhibit A at 49, 56.  To confirm *any* plan – whether under subchapter V or not – he must do a fair and thorough investigation and pursue viable causes of action for the benefit of creditors.  Respectfully, he cannot conduct a fair and thorough investigation of his transfers to his wife and father, among others.  If he cannot act fairly as a debtor-in-possession, he should not be in chapter 11 and conversion is warranted.

62.      Finally, based on his own testimony at the section 341 meeting, there is nothing to "reorganize" in chapter 11.  He has no job, claims to have no money, and has taken no steps to try to monetize or otherwise secure assets to satisfy claims of his creditors.  This bankruptcy case is, at heart, an investigation and litigation driven case, not a reorganization case.  He has taken no steps to commence any investigation and cannot be expected to do so fairly in the context of a chapter 11 case.  In the absence of such an investigation and pursuit of causes of action, he cannot confirm a plan of reorganization and this case will sit in bankruptcy indefinitely.  *See* 11 U.S.C. §§ 1129(a)(7)(A)(ii); 1191(a).

63.      For these reasons, Cigna respectfully submits that cause exists to convert this case to chapter 7.

### **CONCLUSION**

For the foregoing reasons, Cigna requests that the Court sustain this Objection and strike the subchapter V designation or, in the alternative, compel Mr. Durall to amend his Petition promptly to remove the subchapter V designation or convert this case to a case under chapter 7. Cigna further requests all other relief to which it is entitled.

[*Remainder Of Page Left Intentionally Blank*]

Date: June 10, 2024.                                 **EFR LAW FIRM**

                                                     /s/ Eduardo Rodriguez
                                                     Eduardo F. Rodriguez (Fla. Bar No. 36423)
                                                     800 S. Douglas Road, Suite 350
                                                     Coral Gables, Florida 33134
                                                     Telephone: (305) 340-0034
                                                     E-mail: eddie@efrlawfirm.com

                                                     *and*

                                                     **ALSTON & BIRD LLP**

                                                     William S. Sugden (*pro hac vice pending*)
                                                     Kennedy R. Bodnarek (*pro hac vice pending*)
                                                     1201 W Peachtree St NE #4900
                                                     Atlanta, GA 30309
                                                     Telephone: (404) 881-7000
                                                     Facsimile: (404) 881-7777
                                                     E-mail: will.sugden@alston.com
                                                     kennedy.bodnarek@alston.com

                                                     *Attorneys for Cigna Healthcare of Georgia Inc.*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via regular U.S. Mail to Debtor, Aaron Durall, 7822 Marvanna Lane, Parkland, FL 33076 and by electronic mail to Debtor's Counsel Susan D Lasky, Susan D. Lasky, PA, 320 SE 18 Street Fort Lauderdale, FL 33316, Jessica@SueLasky.com, the subchapter V trustee Tarek Kirk Kiem, PO Box 541325, Greenacres, FL 33454, trustee@kiemlaw.com, and the U.S. Trustee, through its counsel, Martin P Ochs, 75 Ted Turner Drive, Suite 362, Atlanta, GA 30303, martin.p.ochs@usdoj.gov, and to all parties who receive notice electronically through CM/ECF on this 10th day of June 2024.

**ALSTON & BIRD LLP**

*/s/ Kennedy R. Bodnarek*
Kennedy R. Bodnarek (*pro hac vice pending*)
1201 W Peachtree St NE #4900
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
E-mail: kennedy.bodnarek@alston.com

*Attorney for Cigna Healthcare of Georgia Inc.*