IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| In re:<br><br>AARON DURALL,<br><br>          Debtor. | Case No. 24-14573-SMG<br><br>Chapter 11<br><br>Subchapter V |

## OBJECTION OF CIGNA HEALTHCARE OF GEORGIA INC. TO DEBTOR'S EXPEDITED MOTION TO DISMISS

Cigna Healthcare of Georgia Inc. ("Cigna") by and through undersigned counsel, hereby files this objection (the "Objection") to the Debtor's *Expedited Motion to Dismiss Case* [D.E. 43] (the "Motion"). In support of this Objection, Cigna respectfully states as follows:

### PRELIMINARY STATEMENT

Few cases have ever screamed out more for Court oversight, as well as oversight by an independent and disinterested fiduciary.[1]  Having *admitted* to transferring millions of dollars to related parties for no consideration prior to the petition date, the Debtor appears to have initially filed this case to further hinder and delay Cigna and other creditors' efforts to hold him financially accountable.  He did so without regard for the Bankruptcy Code's transparency requirements and creditor protections.  The Motion is an attempt to avoid the transparency he invited by filing this case.  Granting the Motion is not in the best interests of creditors.  It should be denied and this case should be converted to chapter 7.

---

[1]     Cigna previously filed its *Objection to Debtor's Subchapter V Election or, in the Alternative, Motion to Convert to Chapter 7*. [D.E. 24.]  Because the Debtor requests dismissal of this case, in addition to his conduct as debtor-in-possession (summarized below), Cigna submits that it is improper for this case to remain in chapter 11.  As such, Cigna respectfully requests conversion of this case to chapter 7, its proposed alternative relief in its original motion.

The transparency obligations of the Bankruptcy Code were made clear to the Debtor at his section 341 meeting of creditors.[2]  He was forced to testify (without the U.S. Trustee or creditors having the benefit of robust discovery) that he transferred $690,000 of proceeds from the sale of a Ferrari to his wife 70 days before filing for bankruptcy and after the Arbitration Award was entered against DL Investment Holdings, LLC ("DL Investment").  He promised at that time – under oath – to deposit those sums into a DIP bank account.  He has provided no proof that he has yet done so (and, on information and belief, has not done so as of the filing of this Objection).

After giving conflicting testimony about a watch that he said was worth at least $40,000, he promised to provide photos of that watch to the U.S. Trustee.[3]  As of the filing of this Objection, he has not done so.

He testified to giving millions of dollars to family members for no consideration.  *See* D.E. 24, Exhibit 1 at 8-9.  When pressed about the amount, he provided answers that were not (a) credible; or (b) consistent with discharging his obligations as a chapter 11 fiduciary.  For instance, he couldn't estimate the amount of these transfers within millions of dollars, though he admits he has access to (but has not reviewed) relevant bank statements.  *Id*. at 49-54.  When

---

[2]     The Section 341 meeting of creditors was held on June 5, 2024, at 9:00 a.m. *See* D.E. 11.

[3]     The reason the U.S. Trustee was forced to demand these photos is itself notable.  The Debtor scheduled a "Piquet Royal Oak" watch. [D.E. 1 at 15.]  This is a watch that is described online as a "hype watch" that is "highly sought-after, ultra-valuable, and instantly recognizable." At the section 341 meeting, he testified that the watch was actually a Patek Philip (another very valuable watch), which he keeps in his drawer.  *See* D.E. 24, Exhibit 1 57-61.  He claimed that he had been given (and later sold) the Piquet watch.   If this testimony is true, then he has misstated (and not corrected) his Schedules (if it is in fact an error).  No one, other than the Debtor himself, currently knows the truth.  And he has defaulted on his sworn commitments to the U.S. Trustee to provide photographs of the watch in question that resides in his drawer.

pressed, he stated that he transferred less than $10 million, but he couldn't be sure whether he transferred $1 million or $5 million.  *Id*.

This testimony is likely just the tip of the financial iceberg.  As a result, Cigna promptly served Rule 2004 discovery on Mr. Durall and other relevant parties to investigate.  [D.E. 27, 28, 29, 30, 31 and 32.]  What followed is breathtaking.

- The *day after* Cigna served a subpoena for Rule 2004 discovery on DL Investment – the entity against which it holds a judgment for more than $20 million – the Debtor (without notice to or relief from this Court) – purported to dissolve the entity.[4]

- Instead of responding to the Rule 2004 requests that Cigna served on him, Mr. Durall caused his counsel to file a motion for protective order (the "Protective Order Motion") that is without merit.  [D.E. 49.]  Cigna has separately objected to this motion.  [D.E. 61.]

- After he filed the Motion, Cigna served discovery to investigate core alleged facts asserted therein (which are inconsistent with the Debtor's sworn testimony at the section 341 meeting).  [D.E. 51.]  He has not responded to this discovery or produced any documents (given the timing of the hearing, the response deadline is the morning of the hearing).  Should he fail to respond to this discovery fully and properly, that failure will be an independent basis to deny the Motion.[5]

- Each of the other individuals who Cigna served with a Rule 2004 subpoena filed belated (and therefore improper) joinders (the "Discovery Joinders") to the Protective Order Motion. They each purported to file *pro se*.  [D.E. 57, 58, 71.]

---

[4]    A true and correct copy of this filing, available online on the Florida Secretary of State's website – is attached hereto as **Exhibit A**.  DL Investment is a non-debtor in which Mr. Durall owns a "substantial or controlling interest."  Schedules at 40 [D.E. 1]; 2015.3(c).  Mr. Durall was required to report the "value, operations, and profitability" of this entity no later than May 30, 2024.  He defaulted on this obligation and instead dissolved the entity rather than respond to discovery.  This is no small issue.  Upon information and belief, this entity has historically reported more than $100 million of Gross Receipts to the IRS.

Mr. Durall presumably used his membership interests in this entity – which membership interests are themselves assets of his bankruptcy estate – to cause the dissolution (Cigna is investigating this).  If so, this would constitute an improper use of estate property outside of the ordinary course of business without court approval.

[5]    *See* Fed. R. Civ. Pro. 37(b)(2)(A)(iii).

None of them has yet responded to discovery and all are now in default because of the belated nature of their filings. *See* Local Rules 2004-1(C).

- The Discovery Joinders appear to have been prepared by the same person (they are very similar and contain identical typos). They also appear to have been prepared by an attorney. Cigna served subpoenas on each of these parties as well as Debtor's counsel to determine (a) whether these purported *pro se* parties were in fact advised by counsel in connection with the Discovery Joinders, and (b) what role, if any, Debtor's counsel played.[6] [D.E. 66, 67, 68, 69] As of the date of this Objection, none of these parties have responded to these subpoenas.

- DL Investment, the one juridical entity that Cigna served with a Rule 2004 subpoena, also filed a belated joinder. [D.E. 72]. That joinder contains the same similarities and typos as the others. *It was also filed by the Debtor himself purporting to act as the attorney of record for DL Investment.* As of the section 341 meeting, the Debtor testified under oath that he was not a member in good standing of the Florida Bar. Since that time, he appears to have taken steps to (a) reactivate his law license, (b) be engaged by DL Investment (which he has also purported to dissolve without court oversight), and (c) object to discovery on behalf of DL Investment that seeks to uncover potential connections and claims *between his bankruptcy estate and DL Investment.*[7] Cigna is serving additional Rule 2004 subpoenas on the relevant parties to investigate this filing.

---

[6]     The Discovery Joinders appear to have been drafted on forms that are identical to the forms used by Debtor's counsel in this case, among other things. On May 30, 2024, Debtor's counsel swore that she is "disinterested" and that she "represents [no] interest[s] adverse to the debtor(s) or the estate." [D.E. 21]. She has filed no supplemental affidavits disclosing any connection to any party in interest in this case. To serve as counsel under section 327(a), she has an affirmative (and continuing) obligation to disclose any "connections" to parties in interest. *See* Bankruptcy Rule 2014(a). Cigna respectfully submits that, if she has prepared or otherwise given advice to any of these parties with respect to the Discovery Joinders, such activities are "connections" required to be disclosed under Rule 2014(a) as a condition of her employment.

[7]     The questions this filing raise almost defy adequate description. Among other things:

- Did the Debtor use estate assets outside of the ordinary course of business without court authorization to reactivate his law license?

- Why didn't the Debtor (who testified that he had not practiced law in the nine years prior to the petition date) obtain court authority to be engaged by DL Investment (an act outside of his ordinary course of business)?

- What steps, if any, did the Debtor take to advise DL Investment of his conflict of interest in representing it in connection with his own chapter 11 case (where he purports to act as a fiduciary for his bankruptcy estate and its creditors)?

4

This conduct is highly suspect and warrants further investigation.  The Debtor does not deserve the absolution that he appears to believe will come with dismissal of this case and, in any event, dismissal is legally unwarranted.

The Motion is governed by sections 305 and 1112 of the Bankruptcy Code.  Under applicable law, the Debtor does *not* have the unqualified right to the relief he seeks.  *He has the burden to establish that dismissal is in the best interests of creditors*.  He cannot meet this burden.  Under the facts of this case, the Bankruptcy Code provides critical creditor rights and protections that warrant this case remaining in bankruptcy and being converted to chapter 7.  Specifically, bankruptcy will provide creditors with the following necessary protections, among other things:

- Section 108 tolling of statutes of limitations.  The Debtor claims that many of the transfers disclosed at his section 341 meeting occurred more than four years prior to the petition date.  Putting aside equitable tolling and other potential remedies, section 108 will preserve the status quo with respect to any statute of limitations issue and provide an adequate opportunity to investigate these claims while ensuring that they are not lost to a statute of limitations defense post-dismissal.

---

- What steps, if any, did the Debtor take to determine that he could represent DL Investment notwithstanding his conflict (and did the Debtor improperly use estate funds without court authorization to make such a determination by, for instance, obtaining an independent legal opinion from a legal ethics expert)?

- Did the Debtor obtain DL Investment's informed consent in writing to this conflict representation (*see Conflict of Interest; Current Clients*, R. Regul. FL. Bar 4-1.7(b)(4)) and, if not, has he potentially saddled the estate with an administrative claim by DL Investment for malpractice or breach of fiduciary duty?

- What are the terms of and compensation received by the Debtor for his representation of DL Investment, and have those amounts been deposited into the DIP account?

- What role, if any, did Debtor's counsel play in connection with the Debtor's reactivation of his law license and retention by a party in interest in this Bankruptcy Case?

- Bankruptcy Court oversight over the hundreds of thousands of dollars of cash that the Debtor concedes is part of the estate, which oversight will ensure such funds (and others that may be brought into the estate) are preserved for the benefit of all creditors.

- Availability of section 549 to avoid unauthorized postpetition transfers. Cigna has summarized some of the currently known and potentially unauthorized postpetition transfers above. A thorough and independent investigation of all postpetition transfers is warranted and section 549 provides a vehicle to recover unauthorized transfers.

- Availability of the other enhanced avoidance powers under the Bankruptcy Code to supplement state law avoidance powers.

- Availability of the relevant bankruptcy provisions of title 18 of the United States Code.

- Appointments of an independent, disinterested trustee under chapter 7 to manage the estate, investigate the Debtor's conduct, waive (if that fiduciary deems appropriate) the Debtor's attorney-client and other privileges (to the extent that such privileges apply in the first instance) with respect to his various counsels, and bring actions to avoid and recover assets for the collective benefit of all creditors.

- The availability of substantive consolidation of the Debtor's estate with other individuals and entities through which the Debtor has (and continues to) perpetrate his fraudulent conduct as a creditor remedy.

Similarly, if this Debtor is an "honest but unfortunate debtor," he will benefit from this case remaining open and being converted to chapter 7. With a chapter 7 trustee in place, the trustee can conduct an open, transparent and fulsome investigation of the Debtor (Cigna intends to participate and assist). If the Debtor has not engaged in improper and illegal conduct, he can prove that up through a single unified investigation that will benefit all creditors and allow him to avoid a multiplicity of investigations by his various creditors in different forums. Similarly, if he can meet the requirements of the Bankruptcy Code, he may also be eligible for a discharge of indebtedness. Thus, while it is not legally relevant to the Motion, keeping this case open and converting it to chapter 7 may also benefit the Debtor himself, especially if there are legal justifications for his behavior.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Objection pursuant to 28 U.S.C. § 1334. This Objection is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I) and this Court has authority to enter a final order or judgment on this matter.

2.      The statutory and legal predicates for the Objection are Sections 101, 305, and 1112 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 1017, (the "Bankruptcy Rules").

## BACKGROUND

3.      The Debtor submitted himself to the jurisdiction of this Court by filing his petition on May 9, 2024.

4.      Cigna incorporates by reference the factual assertions raised in *Cigna Healthcare of Georgia Inc.'s Objection to Debtor's Subchapter V Election or, in the Alternative, Motion to Convert to Chapter 7* filed on June 10, 2024, (the "Objection to Subchapter V Election") at D.E. 24.

### *The Debtor's Fraudulent Scheme Run Through DL Investment*

5.      The Debtor and Neisha Zaffuto defrauded Cigna (and others) through a urine testing services pass-through billing scheme operated through DL Investment. They purchased a small rural hospital, Chestatee Regional Hospital in Dahlonega, Georgia, for $15 million (through DL Investment, which they own and control) and began to submit large numbers of fraudulent health insurance claims for urine drug testing services to take advantage of the favorable in-network reimbursement rates that Chestatee had with Cigna, even though those services were performed (if at all) at a different location by a commercial drug laboratory that they owned and operated out of Sunrise, Florida (which was out-of-network with Cigna).

6.      Through this scheme, the Debtor and Ms. Zaffuto made substantial amounts of money from private health insurers, such as Cigna, that unwittingly reimbursed for the urine drug tests at rates that were substantially in excess of what the insurers would have paid had the Debtor and Ms. Zaffuto truthfully disclosed that the tests were run (if at all) at their commercial drug laboratory in Florida. They directed money from the urine drug test reimbursements to DL Investment, rather than the hospital's operating accounts.

7.      The Debtor appears to have used the money flowing into DL Investment's accounts for his own personal use. Cigna believes that the proceeds from this scheme include payments to the Debtor of at least $184,407,671.87 (as well as at least $10,902,011.30 to Ms. Zaffuto).[8]

8.      Based on information currently available to Cigna, DL Investment acted merely as a pass-through vehicle for the Debtor's and Ms. Zaffuto's ownership of Chestatee to receive the monies from their insurance reimbursement fraud.

9.      Before discovering the fraud scheme, Cigna reimbursed almost $13 million solely for urine drug tests, based on the fraudulent representation that those services had been performed at Chestatee (when, in fact, they had not).

---

[8]      *See United States v. Perez, et al.*, Case No. 20-cr-00086-TJC (M.D. Fla. Oct. 7, 2020) D.E. 180 at 31-38. The Debtor was indicted and then acquitted of federal criminal charges of conspiracy, healthcare fraud, conspiracy to commit money laundering, and money laundering by the District Court for the Middle District of Florida in the case styled *United States v. Perez, et al.*, Case No. 20-00086. *See id.* D.E. 180 (superseding indictment).

In this criminal case's first trial, two of the Debtor's alleged co-conspirators were convicted, but the jury hung as to the Debtor. In the second trial, the Debtor's co-defendants testified about his involvement in the criminal conduct. The jury reported that it was deadlocked on a verdict. Only after the judge issued an "Allen charge" did the jury return a not-guilty verdict as to the Debtor. Five of the Debtor's criminal co-defendants were convicted or pleaded guilty, and one fled the country. *Id.* at D.E. 143–51, 619, 768-75, 977-80, 1005, 1007.

10. Prior to DL Investment's sale of Chestatee in April 2018, DL Investment made more than $130 million from reimbursements of urine drug testing alone. Due to the Debtor's and Ms. Zaffuto's misappropriation of assets from Chestatee, the rural hospital was forced to close shortly after the sale resulting in the layoff of approximately 200 employees.[9]

### The Arbitration, Award, and Confirmation

11. Following an arbitration hearing under the rules of the American Health Law Association, the arbitrator issued an award to Cigna against DL Investment for breach of contract, violation of the Employee Retirement Income Security Act of 1974, fraud, negligent misrepresentation, unjust enrichment, and conversion on December 1, 2023 (the "Award").[10]

12. The Award to Cigna totaled $20,667,019, consisting of an award of $61,900 in arbitrator compensation and expenses, $1,711,994 in attorney's fees and costs, and $18,893,125 in restitution and prejudgment interest.[11]

### The Alter Ego Actions Against the Debtor and Ms. Zaffuto

13. On December 21, 2023, Cigna filed a timely petition to confirm the Award against DL Investment in the United States District Court for the Southern District of Florida

---

[9] *See* https://www.wabe.org/chestatee-regional-hospital-may-get-new-owners-temporarily-close/.

[10] *See* Objection to Subchapter V Election, D.E. 24, Exhibit B.

[11] The Debtor scheduled Cigna as holding a claim of $20 million. While this amount is less than a 4% difference from the true amount of the Award (and the difference itself is immaterial to this Objection), Cigna submits that it is indicative of the cavalier manner with which the Debtor has approached this bankruptcy case. That difference (more than $650,000) is *far* more than most individual debtors report in ***total*** liabilities in their bankruptcy cases. *See* Bankruptcy Abuse and Prevention Act Statistics and Reports during the 12-month period ending December 31, 2023, Table 1X (*available at* https://www.uscourts.gov/sites/default/files/data_tables/bapcpa_1x_1231.2023.pdf) (reporting total liabilities of approximately $65.6 billion in 425,413 individual debtor cases filed in the United States in 2023, which equates to average liabilities of approximately $154,000).

(the "District Court") in the case styled *Cigna Healthcare of Georgia, Inc. v. DL Investment Holdings, LLC et al.*, Case No. 23-62393 (S.D. Fla. Dec. 21, 2023) D.E. 1. In the same action, Cigna named the Debtor and Ms. Zaffuto as defendants, seeking to hold them liable for the Award under alter ego theories.[12]

14.    The District Court confirmed the Award by an order entered on May 24, 2024[13] and entered a final judgment as to DL Investment on June 27, 2024.[14]

15.    On June 10, 2024, District Court dismissed Cigna's alter ego claim against the Debtor and Ms. Zaffuto on procedural grounds only. *See* D.E. 39, at 6-7.  The Court made no substantive decisions with respect to Mr. Durall's liability to Cigna as an alter ego of DL Investment.  As the District Court stated: "Cigna is not without recourse [against Mr. Durall and Ms. Zaffuto]." *Id.*

### The Debtor's Failure to Return Assets to the Estate

16.    The Debtor previously owned a Ferrari Spider that he claims to have sold for $690,000 on February 29, 2024 – 70 days before filing for bankruptcy – despite reporting no cash in his schedules. *See* SOFA, D.E. 1, *c.f.* Schedule A/B, D.E. 1. He testified at his 341 meeting that he wired those proceeds to his wife, who continued to hold those amounts. *See* D.E. 24, Exhibit A at 26-27. He asserted – more than a month ago at the 341 meeting – that she held these amounts because he was unable to open a bank account, though he admitted then that he has a DIP bank account. *Compare id*. at 26:25 *with id*. at 22:10-14.

---

[12]    *See* Objection to Subchapter V Election, D.E. 24, Exhibit C.

[13]    *See* Objection to Subchapter V Election, D.E. 24, Exhibit D.

[14]    *Cigna Healthcare of Georgia, Inc., v. DL Investment Holdings, LLC, Aaron Durall, and Neisha Zaffuto*, Case  No. 23-62393 (S.D. Fla. June 11, 2024) D.E. 48.

17.     As of the 341 meeting, the Debtor had not transferred the proceeds from the sale of the Ferrari Spider to the DIP account that had a zero balance. *See id.* at 22. The U.S. Trustee asked, "[a]re you are you going to take steps to transfer [the proceeds from the sale of the Ferrari Spider] to the Debtor-in-Possession account?" *Id.* at 27:13-24. The Debtor affirmed that he understood the requirement to transfer the sale proceeds into his DIP account and would speak with his counsel on how to do so. *Id.* at 27, 71.

18.     Upon information and belief, as of the date of this Objection, more than a month after the section 341 meeting, the funds still have not been returned to the DIP Account.

19.     The Debtor also testified at his 341 meeting that he had checks in his possession to be deposited into his DIP account but simply had not gotten around to it. *Id.* at 22-23. When the U.S. Trustee requested prompt deposit of the checks, he explained to the Debtor "you are a fiduciary in bankruptcy and you have an obligation to manage your funds in an appropriate way. And leaving checks undeposited, in my opinion, doesn't meet your fiduciary duties." *Id*. at 23:16-20. The Debtor answered affirmatively that he understood his obligations. *Id.* at 24.

20.     Upon information and belief, as of the date of this Objection, the checks still have not been deposited into to the DIP Account.

21.     The Debtor also scheduled a "Piquet Royal Oak" watch, but when questioned about this watch, he testified that he incorrectly listed this luxury watch, that he no longer had the watch, and that the watch he has is, instead, a Patek Phillipe. *See id.* at 58-59.

22.     The U.S. Trustee requested photos of the watch in the Debtor's possession within 10 days. *Id.* at 71:17-19 ("the pictures that I've asked for, today is June 5th, 2024. Ms. Lasky, do you think it's appropriate that my request is 10 days to turn that information over to the United States Trustee?"). The Debtor's counsel was amenable to and agreed to provide the photos

within 10 days of the 341 meeting. *Id.* at 71:20-23. On information and belief, the Debtor has not provided the photo of the watch as requested by the United States Trustee as of the date of this Objection.

### The Debtor's Failure to Respond to Discovery Related to the Motion

23.     The Debtor has not worked in years and instead purports to live off money he has transferred to his wife for no consideration. *Id.* at 8-9, 12, 37. The Debtor, however, could not (or would not) identify how much money his wife had in her accounts at his 341 meeting, though he has access to the bank statements. *See id.* at 49-50, 53-54.

24.     The Debtor made specific representations as to his income and tax returns in the Motion that the Debtor did not disclose at his section 341 meeting. *Compare* D.E. 24, Exhibit A *with* D.E. 43. Cigna served a request for the Debtor to produce documents supporting the representations in the Motion on or before 8:00 a.m. on July 10, 2024. D.E. 51. The Debtor has so far failed to produce any documents in support of the factual assertions pled in the Motion. Debtor's counsel has informally contended that the Debtor is not required to respond to this discovery because she believes that Cigna does not have standing.[15]

### The Debtor and His Accomplices Fail to Respond to Rule 2004 Subpoenas

25.     As detailed in the Preliminary Statement, Cigna served targeted Rule 2004 discovery after the section 341 meeting to relevant parties, including the Debtor and third parties, to investigate the Debtor's prepetition transactions and other conduct.

26.     To date, neither the Debtor nor any of the subpoena parties have substantively responded to the discovery or produced any documents or communications responsive to the

---

[15] *See* **Exhibit B** attached hereto.

subpoenas.  The Debtor timely filed a motion for protective order on June 21, 2024 (the "Motion for Protective Order").  D.E. 49. Each of the subpoena parties filed belated joinders and the one juridical entity that was the subject of a subpoena – DL Investment – appears to have retained the Debtor to file its joinder.  Cigna has objected to the Motion for Protective Order and joinders. D.E. 61.

### *The Proofs of Claim and Bar Date*

27.     The bar date for filing proofs of claim in this case is set for July 18, 2024 (the "Bar Date"). D.E. 12.

28.     As of the date of this Objection, claims totaling $792,054.23 have been filed by five creditors including Resurgent Capital Services, Broward County, Florida, Vanaz Land Company, LLC, Capital One N.A., and UnitedHealthcare Insurance Company.

29.     Cigna will file its proof of claim prior to the Bar Date in an amount not less than $20,667,019.

30.     The Debtor states in his Motion that in connection with this bankruptcy case he "negotiated a settlement with his largest judgment creditor." Motion at 4 (presumably discussing Vanaz Land Company). As of the date of this Objection, the Debtor has not sought approval from this Court to authorize and approve the purported settlement as required by Bankruptcy Rule 9019.  Nor has the Debtor responded to Cigna's discovery requests related this purported settlement.

### I.   **ARGUMENT AND AUTHORITY**

31.     It is the Debtor's burden to establish that dismissal would be in the interests of creditors.  Cause does not exist to dismiss the Debtor's case when dismissal would be detrimental to creditors or the estate.

32.     Under the plain language of Section 1112, a chapter 11 debtor does not have an absolute right of dismissal. "Unlike Chapter 7 and 13, voluntary dismissal in Chapter 11 is not a debtor's right but rather turns on **whether the relief is in the best interest of creditors**." *Francis v. Harrington (In re Francis)*, BAP NO. MB 18-012, 2019 Bankr. Lexis 826, at *14-15 (B.A.P. 1st Cir. 2019) (emphasis added).

33.     Each of the Debtor's claimed bases for dismissal is without merit.  First, any suggestion that Cigna is not a creditor, that it has no claim against the Debtor, or that it does not have standing is in error.  *See* D.E. 43.  Second, this case is not a "two party dispute" that warrants dismissal.  There are important creditor protections for Cigna and others in maintaining this case open and converting it to chapter 7.  Third, and relatedly, the best interests of creditors warrants that this case remain open (and, indeed, converted to chapter 7).

**A.     Cigna is a Creditor with a Claim in this Case.**

34.     The Debtor asserts, without analysis, that Cigna presently has no claim against the Debtor.  *See* D.E. 43 ¶ 20 ("Cigna has not sought relief from the stay to commence pleadings supplementary and until Cigna is granted leave to do so, Cigna has no claim against the Debtor, individually.").  The Debtor has also informally objected to Cigna's discovery on the Motion through counsel, though he has not formally responded.  *See* **Exhibit B**.

35.     The Debtor's position is incorrect.  Section 101(5) of the Bankruptcy Code defines a "claim" as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

equitable, secured, or unsecured." The existence of a claim does not depend on Cigna seeking or this Court's granting of relief from the automatic stay as the Debtor contends.[16]

36.    The District Court Opinion makes clear that Cigna may be able to hold the Debtor liable under an alter ego theory through supplementary proceedings. *See* D.E. 39, at 6-7. While Judge Damian held that Cigna "cannot assert an independent cause of action for alter ego," *id.* at 6, she invited Cigna to commence proceedings supplementary once a final judgment against DL Investment was entered. *Id.* at 6-7. "Cigna is not left without recourse, as it may seek leave to commence proceedings supplementary to plead allegations related to its alter ego theory and implead third parties to such supplementary proceedings to collect on the final judgment." *Id.* at 6-7.

37.    The District Court Opinion did not analyze or adjudicate the substance of Cigna's claim for alter ego against the Debtor and Ms. Zaffuto. *See id.* Now that the District Court has entered a final judgment as to DL Investment in the District Court action,[17] the issue of Mr. Durall's and Ms. Zaffuto's liability to Cigna is itself ripe for adjudication.[18] There is no

---

[16]    Such a conclusion would lead to absurd results inconsistent with the purpose and practice of bankruptcy law.  Logically, if Cigna's status as a creditor with a claim depended upon it seeking and obtaining stay relief, it could strategically choose not to participate in this bankruptcy with no consequences to it (and none of the benefits of bankruptcy protection to the debtor) if it didn't file a proof of claim.  For instance, if Cigna's status as a creditor with a claim is dependent upon this Cigna seeking stay relief and this Court finding cause for stay relief, (a) the Bar Date should not apply to Cigna with respect to its rights against the Debtor, and (b) any discharge granted to the Debtor should not bar Cigna's continued pursuit of its rights against the Debtor.  This is facially incorrect.

[17]    *See supra* note 13.

[18]    Mr. Durall's filing of this bankruptcy case introduces some procedural complexities with respect to the alter ego action because the automatic stay imposed in this case currently prevents Cigna from commencing proceedings supplementary that implicate him in the District Court.  There are remedies, any of which Cigna can promptly pursue after the adjudication of the Motion to Dismiss.  Cigna is prepared to seek stay relief for the limited purpose of establishing Mr. Durall's liability as an alter ego of DL Investment (with distribution on the claim to be subject to

therefore plausible argument that Cigna is not a creditor of this Debtor as defined in the

Bankruptcy Code.

**B.     This Case Is Not a Two-Party Dispute.**

38.     The Debtor claims, without analysis, that this case should be dismissed, in part,

on "two party dispute" grounds. *See* D.E. 43 at 5 ("The two party dispute between Mr. Durall

and Cigna is of no benefit to creditors with existing claims whose payment should not be delayed

by the ongoing litigation between Cigna and Mr[.] Durall."). This case is neither a two-party

dispute nor is the two-party dispute line of cases apposite to this situation.

39.     First and foremost, the two-party dispute line of cases generally arise in one of

two contexts: (i) where a debtor has filed a bankruptcy to thwart pursuit by an individual creditor

and the court determines that the case was filed in bad faith after the creditor seeks dismissal;[19]

or (ii) where the creditor files an involuntary case against the debtor as a bad faith litigation

tactic and the debtor seeks dismissal.[20] Neither of these situations is present here. The Debtor

invoked the jurisdiction of this Court by filing this case voluntarily. No creditor has sought

---

distributions in this case). Cigna is also prepared to consent to consolidate the District Court
proceeding in this Court, though that may require the consent of Ms. Zaffuto. Alternatively, it
may be most appropriate to defer this litigation until after a chapter 7 trustee has concluded an
investigation. If the chapter 7 trustee (or a creditor) elects to seek substantive consolidation of
Mr. Durall's estate with the assets and liabilities of DL Investment, among others, the resolution
of that litigation may moot the need for Cigna to litigate the issue of Mr. Durall's alter ego
liability separately.

[19] *See, e.g., Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Virginia (In re Phoenix Piccadilly, Ltd.)*,
849 F.2d 1393, 1394 (11th Cir. 1988) (affirming dismissal of chapter 11 case filed by owner of
apartment complex that was subject to foreclosure action filed by secured creditors prior to
bankruptcy filing); *State St. Houses, Inc. v. New York State Urban Dev. Corp. (In re State St.
Houses, Inc.)*, 356 F.3d 1345, 1346-47 (11th Cir. 2004) (same).

[20] *See e.g. In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) (Third Circuit
affirmed dismissal of involuntary petition as filed in bad faith when creditor in two-party dispute
intended to frustrate involuntary debtor's efforts to litigate).

dismissal of this case.  And, based on the facts presented here, the creditors (including Cigna) desire the creditor protections afforded by bankruptcy, notwithstanding the attendant creditor limitations (such as the automatic stay).  Cigna submits that this context – the Debtor's voluntary filing and creditor support for maintaining this case open – takes it analytically outside of the "two party dispute" bad faith filing dismissal line of cases.

40.     Regardless of whether the two-party dispute line of cases is even applicable, it is also plain from the record of this case that this case is *not* a two-party dispute. First, a total of five creditors (not including Cigna) have already filed proofs of claim against the Debtor.  *See generally* Claims Register.  This includes at least one creditor (UnitedHealthcare Insurance Company) that also asserts unadjudicated alter ego liability against Mr. Durall.  *See* Claims Register at 5.  Upon information and belief, there is no settlement of any claim between the Debtor and UnitedHealthcare Insurance Company.  Furthermore, the Bar Date has not yet passed and additional claims are likely to be filed.  Thus, this case is factually *not* a two-party dispute.

41.     The Debtor claims that this case should be dismissed as a two-party dispute because he has negotiated a settlement with his one judgment creditor.  He discloses none of the details of that alleged settlement in the Motion and has resisted Cigna's efforts to discover relevant facts about the alleged settlement through discovery on the Motion.

42.     Taking his claim at face value and as asserted in the Motion, it still fails.  A multiparty bankruptcy case cannot be converted into a two-party dispute simply because a debtor settles with one creditor to the exclusion of others. In the case of *In re Kingbrook Dev. Corp.*, the bankruptcy court denied the voluntary debtor's motion to dismiss its case when the debtor argued that, after it resolved a foreclosure claim with its secured creditor, the case thereafter became a two-party dispute with a remaining creditor. 261 B.R. 378, 379 (Bankr. W.D.N.Y. 2001). The

17

bankruptcy court held that the case was not a genuine two-party dispute when there were other creditors in the case that continued to have an interest in an allocation of the estate's assets. *Id.* ("The debtor is simply without justification for its argument that this case has become a two-party dispute."). The Court explained that dismissal of the case was inappropriate when "[i]n filing its voluntary petition for relief, the debtor obtained the protections of Chapter 11, but on condition of its acceptance of the restrictions and limitations of the bankruptcy process. Among the goals of the bankruptcy process is maximization of distribution to creditors. In working to achieve this goal, the debtor is a trustee for the benefit of all creditors." *Id.*

43.     Similarly, the court in *In re Just Plumbing & Heating Supply, Inc.* denied the voluntary chapter 11 debtor's motion to dismiss its case after it resolved a dispute with is secured creditor and stated that it would resolve claims with remaining creditors outside of bankruptcy upon dismissal. *See* No. 11-10151 (MG), 2011 Bankr. LEXIS 4021, at *7-8 (Bankr. S.D.N.Y. Oct. 18, 2011) citing *Kingbrook Dev. Corp.*, 261 B.R. at 380. Instead, the bankruptcy court emphasized that settling with one creditor does not render the bankruptcy case so unnecessary as to deprive creditors of their protections in the bankruptcy court. *Id.* at *9 (quoting *Kingbrook Dev. Corp.*, 261 B.R. at 380 ("Absent either the affirmative consent of all creditors to a dismissal or proof of full repayment of unsecured claims, this court is disinclined to deprive creditors of the bankruptcy protections and rights to which they are now entitled.")).

44.     In fact, settling with creditors can be evidence that the case is *not* in fact a two-party dispute. *In re Cent. Jersey Airport Servs.*, 282 B.R. 176, 181 (Bankr. D.N.J. 2002) ("The court finds that the case is not a two-party dispute, as the Debtor has at least thirteen creditors other than movants [and] the Debtor is legitimately negotiating with its creditors").

45.     Here, the Debtor asserts that he "has negotiated a settlement with his largest judgment creditor and would satisfy that claim without delay. Debtor was current with the payments owed to all other creditors prior to the filing of this case." *See* Motion at 4.

46.     This alleged settlement is presumably with Vanaz Land Company, a judgment creditor that has filed a proof of claim against the Debtor for $449,326. *See* Claims Register at 3. However, this alleged settlement (none of the details of which are set forth in the Motion) raises more questions than it answers. The Debtor claims to have no income, no cash, and no purportedly non-exempt property. *See* Schedules A/B, C, and I. This begs the question of how he can satisfy a near half million dollar judgment "without delay" if this case is dismissed. Indeed, the judgment itself has been outstanding since May 2023.[21]

47.     Why is the Debtor negotiating this settlement now? And why is "satisfy[ing] the claim without delay" justification for dismissal when he appears to have been stifling this same creditor's collection efforts for a year or more prior to filing for bankruptcy? Is this alleged settlement just a tactic to avoid the transparency that the Debtor agreed to accept when he filed for bankruptcy?[22]

48.     The claim allegedly being settled merits scrutiny as well. It arises from an alter ego judgment against the Debtor for debts owed by one of his other entities, Canmed Labs, LLC.

---

[21]     A true and correct copy of the default judgment entered by the Court is attached hereto as **Exhibit C**.

[22]     Given the circumstances here, Cigna submits that it is critical to understand the terms of any alleged settlement. The Debtor has stifled this creditor for more than a year but now the creditor has agreed to a settlement. What promises has the Debtor made to the creditor? Why would the creditor agree to revert to the *status quo ante* that existed pre-bankruptcy when the Debtor can continue to hinder and delay the creditor without court oversight? Has the Debtor already paid the settlement amount to the creditor? Has he pledged assets to this creditor? Are there other relevant facts related to this settlement? The Debtor has resisted any discovery into its terms.

*See* Exhibit C. This is the same theory of liability Cigna and UnitedHealthcare assert against

him. Additionally, when the Debtor attempted to set aside the default judgment against him

personally in that case (on August 1, 2022), he filed motion papers identifying his address as

"9447 Satinleaf Place, Parkland Florida, 33076."[23] The Debtor does not identify this residence

in his Schedules, but under questioning at his section 341 meeting, he claimed to have

quitclaimed this property to his father nearly four years earlier. *See* D.E. 24, Exhibit A 13:11-12

("It was quit-claim deeded to my father in 2018."). This is a property that he testified was worth

approximately $1 million.[24]

      49.     The Debtor's claim that he has transformed this case into a two-party dispute by

"settling" with Vanaz Land Company does not withstand scrutiny. He should provide details of

this alleged settlement and answer the questions that are raised by the circumstances of it. As

noted, there are currently a multiplicity of creditors, and the Bar Date has not even passed.

Further, the alleged settlement – and the circumstances of the underlying claim – raise more

questions than they answer. An independent chapter 7 trustee should investigate. The Debtor's

efforts to belatedly settle the claim should not be rewarded with the dismissal that he seeks.

**C.     Conversion, Not Dismissal, Is in the Best Interest of Creditors.**

      50.     In light of Debtor's Motion, Cigna requests conversion of this case as the primary

relief sought in the Objection to Subchapter V Election. *See* D.E. 24.

---

[23]    A true and correct copy of this filing is attached hereto as **Exhibit D**. A true and correct copy of the denial of Aaron Durall's motion to set aside default judgment is attached hereto as **Exhibit E**.

[24]    Further investigation of this is warranted. Why would the Debtor list this address as his residence in 2022 nearly four years after having quitclaimed it to his father? Was he, in fact, living there at the time? If so, what impact does this fact have on the Debtor's claimed exemption of his unencumbered property at 3822 Marvanna Lane that he lists as being worth $3.5 million? Cigna has sought, and continues to seek, to investigate these matters.

### The Court May Convert Even Though the Debtor Prefers Dismissal.

51.     A court may convert a case even if a debtor seeks dismissal. "The plain meaning of § 1112(b) allows the bankruptcy court to convert a debtor's voluntary Chapter 11 case when it is in the best interest[s] of creditors and the estate, even if the Debtor opposes conversion and favors dismissal." *Camden Ordnance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 803 (E.D. Pa. 2000).

52.     Courts may convert a case though a voluntary debtor seeks dismissal because "[o]nce a debtor submits to the jurisdiction of the bankruptcy court and avails itself of bankruptcy protections, the debtor must comply with the Bankruptcy Code. One of those rules is § 1112(b), allowing a bankruptcy court to convert a voluntary Chapter 11 case, even if a debtor wants the case dismissed." *Id.* at 805.

53.     Adherence to the Bankruptcy Code is also fair when "[the debtor] was not compelled to seek protection in bankruptcy and thus, following the statutory framework of the Bankruptcy Code is a fair and necessary requirement for a debtor seeking the benefits of bankruptcy." *Id.*

54.     Here, like in *Camden Ordnance Manufacturing*, the Debtor voluntary submitted himself to the bankruptcy court and must abide by the Bankruptcy Code. The Debtor was not compelled but rather voluntarily filed this case and is therefore subject to the requirements of the Bankruptcy Code including conversion under section 1112(b).

### Cause Exists to Convert This Case.

55.     Cause exists to convert this case to chapter 7 pursuant to section 1112(b). Under section 1112(b) of the Bankruptcy Code, a court may convert a chapter 11 case to chapter 7 "for cause" upon the request of a party in interest. 11 U.S.C. § 1112(b). If the court finds "cause," the

court must determine whether conversion is in the best interests of the creditors and the estate. *In re Sundale, Ltd.*, 471 B.R. 300, 302 (Bankr. S.D. Fla. 2012) (finding cause to convert a chapter 11 reorganized debtors' cases to cases under chapter 7 based upon material default under substantially consummated plan). Section 1112(b) provides a nonexclusive list of grounds for conversion including the gross mismanagement of the estate pursuant to section 1112(b)(4)(B) and the failure to provide information under section 1112(b)(4)(H).

56.    Cause for conversion exists under 11 U.S.C. § 1112(b) when a subchapter V debtor's principal is in a conflicted position as to necessary investigations of fraud. *In re No Rust Rebar, Inc.*, 641 B.R. 412, 414 (Bankr. S.D. Fla. 2022) (converting subchapter V case to chapter 7 also noting that conversion was warranted for clear discrepancies in debtor's schedules regarding existence of assets and claims).

57.    Here, like in *No Rust Rebar*, cause exists to convert this case when conversion is in the best interests of creditors for reasons clear from the Schedules, the section 341 meeting, and the Debtor's conduct in the case since filing. Since commencing this case, the Debtor has not acted as a fiduciary of his estate or his creditors.

58.    On information and belief, the $690,000 in proceeds from the sale of the Debtor's Ferrari Spider that he sold and transferred to his wife 70 days before commencing his case have not been transferred to the Debtor's DIP account despite the express direction of the U.S. Trustee. *See* D.E. 24, Exhibit A at 27:13-24. Nor has the Debtor deposited checks in his possession into his DIP account as directed by the U.S. Trustee. *See* D.E. 24. Further, the Debtor failed to produce pictures of the luxury watch in his possession within 10 days of the section 341 meeting as agreed to by Debtor's counsel. D.E. 24, Exhibit A at 71:20-23.

59.    The Debtor has also sought to avoid all discovery in this case.  Instead of responding to appropriate requests made under Bankruptcy Rule 2004 in response to his testimony at the section 341 meeting, he filed his Motion for Protective Order. D.E. 49. Nor has the Debtor produced any documents pursuant to Cigna's request for production in connection with this Motion. *See* D.E. 51. The Debtor has so far failed to produce any documents in support of the factual assertions plead in the Motion. As of the date of this Objection, not a single document has been provided in response to discovery in this case.

60.    He (or his counsel) also appears to have been behind a systematic effort to thwart relevant discovery from other related parties.  He dissolved DL Investment the day after Cigna served it with a subpoena.  He defaulted in his reporting obligations under Rule 2015.3.  And he had himself readmitted to active status as a member of the Florida Bar to represent DL Investments as an adverse party in his own bankruptcy case.  He also appears to have caused his counsel to become connected to – and conceivably advise – other parties with adverse interests to the Debtor's estate and its creditors by, at a minimum, providing a form to those parties to join the Motion for Protective Order.

61.    The Debtor has taken no apparent steps to act as a fiduciary in this case.[25] He has not collected assets of the estate.  He is not only incapable of conducting a fair investigation for the benefit of creditors, he has taken active steps to thwart that investigation.  And, in doing so, he appears to have violated the Bankruptcy Code multiple times by failing to obtain necessary

---

[25]    In addition to failing to secure the $690,000 in proceeds from the sale of the Ferrari, the Debtor has failed at other basic tasks required of a debtor in possession. For instance, he has failed to comply with his section 1116(1) filing requirements. He has also failed to comply with his filing requirements under Bankruptcy Rule 2015.3, which is relevant to multiple companies he identifies in his Schedules.

Court authorization for activities outside of his ordinary course of business.  He has also potentially exposed his estate to administrative claims arising from professional negligence and breach of fiduciary duties he may owe to his purported client DL Investment to the detriment of the bankruptcy estate, for which he also purports to act as a fiduciary.

62.     Conversion, not dismissal, is in the best interest of the creditors.  It will allow an independent fiduciary to conduct a fair and thorough investigation and pursue viable causes of action for the benefit of creditors.  That trustee (and therefore creditors) will benefit from the trustee having the protections of section 108 tolling for viable causes of action.  The trustee will also have the full arsenal of investigative tools (*i.e.*, Rule 2004 and ownership of the estate's assets, including whatever claims of privilege may exist) and litigation options to deal with the current fact scenario (including section 549 for unauthorized postpetition transfers, the enhanced avoidance powers under the Bankruptcy Code to supplement state law avoidance and creditor recovery protections, and the power – upon the development of an appropriate record – to seek the substantive consolidation of the Debtor's estate with various third parties, if appropriate). The trustee will also be aided in his or her efforts by the criminal bankruptcy provisions of title 18 if and in the event the Debtor or third parties attempt to interfere with investigation, hide assets, or otherwise engage in illegal conduct with respect to this case.  Finally, because significant liquid assets have already been identified, the chapter 7 trustee will undertake the appointment with adequate near-term liquidity to be able to ensure that the chapter 7 estate is properly administered.

## **CONCLUSION**

For the foregoing reasons, Cigna requests that the Court sustain this Objection and convert this case to a case under chapter 7.

Respectfully submitted this 8th day of July 2024.


By: /s/ Eduardo F. Rodriguez
**EFR LAWFIRM**
Eduardo F. Rodriguez
800 S. Douglas Road, Suite 350
Coral Gables, Florida 33134
Telephone: (305) 340-0034
eddie@efrlawfirm.com
Florida Bar No. 36423

      and

**ALSTON & BIRD LLP**
William S. Sugden (admitted *pro hac vice*)
Kennedy R. Bodnarek (admitted *pro hac vice*)
1201 W Peachtree St NE #4900
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
E-mail: will.sugden@alston.com
kennedy.bodnarek@alston.com


*Attorneys for Cigna Healthcare of Georgia Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via regular U.S. Mail to Debtor, Aaron Durall, 7822 Marvanna Lane, Parkland, FL 33076 and by electronic mail to Debtor's Counsel Susan D Lasky, Susan D. Lasky, PA, 320 SE 18 Street Fort Lauderdale, FL 33316, Sue@SueLasky.com, the Subchapter V trustee Tarek Kirk Kiem, PO Box 541325, Greenacres, FL 33454, trustee@kiemlaw.com, and the U.S. Trustee, through its counsel, Martin P Ochs, 75 Ted Turner Drive, Suite 362, Atlanta, GA 30303, martin.p.ochs@usdoj.gov, and to all parties who receive notice electronically through CM/ECF on this 8th day of July 2024.

**ALSTON & BIRD LLP**

*/s/ Kennedy R. Bodnarek*
Kennedy R. Bodnarek (admitted *pro hac vice*)
1201 W Peachtree St NE #4900
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
E-mail: kennedy.bodnarek@alston.com

*Attorney for Cigna Healthcare of Georgia Inc.*

1