**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| In re:<br><br>AARON DURALL,<br><br>Debtor. | CASE NO. 24-14573-SMG<br><br>CHAPTER 7 |
| CIGNA HEALTHCARE OF GEORGIA, INC.,<br><br>Plaintiff,<br>v.<br><br>AARON DURALL,<br><br>Defendant. | Adv. Proc. No. _________ |

**COMPLAINT TO DETERMINE DISCHARGEABILITY**
**OF A DEBT UNDER 11 U.S.C. §§ 523(a)(2)(A) AND (a)(6)**

Cigna Healthcare of Georgia, Inc. ("Cigna" or "Plaintiff"), a creditor and party in interest in the above-styled bankruptcy case, pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) and Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure, requests that the Court determine that certain obligations of Defendant Aaron Durall ("Defendant" or "Debtor") to Cigna are nondischargeable. In support thereof, Cigna represents to the Court as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of this Complaint as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and 11 U.S.C. § 523 since this is a proceeding to determine the dischargeability of a particular debt.

2. Venue is proper in this Court in accordance with 28 U.S.C. §§ 1408 and 1409.

3. In the Debtor's above captioned bankruptcy case (the "Bankruptcy Case"), the Court fixed October 15, 2024, as the last day to file a complaint objecting to the discharge of the Debtor or to determine the dischargeability of certain types of debts. Bankr. D.E. 105.[1]

## FACTUAL ALLEGATIONS

4. Cigna's claim against the Debtor arises from the Debtor's fraudulent scheme run through DL Investment Holdings LLC, a Florida limited liability company ("DL Florida"), as well as potentially DL Investment Holdings LLC, a Delaware limited liability company ("DL Delaware") and other individuals and entities.

### *Chestatee Fraudulent Scheme*

5. In 2014, the Debtor and his co-conspirator, Neisha Zaffuto, opened a drug testing laboratory, named Reliance Laboratory ("Reliance"). Reliance performed urine drug testing services, primarily for patients in drug and alcohol treatment centers all around the country and billed private health insurers for reimbursement as an out-of-network provider.

6. Ms. Zaffuto owned and operated Medivance Billing Service, Inc. ("Medivance"), a medical billing company. Medivance performed billing services for Reliance.

7. In August 2016 the Debtor and Ms. Zaffuto purchased Chestatee Regional Hospital ("Chestatee") for $15 million. The Debtor paid $7.5 million, through the entity then called Durall Capital Holdings LLC, which subsequently began doing business as Chestatee, and later changed its name to DL Investment Holdings, LLC. The Debtor and Ms. Zaffuto never executed a written contract indicating their shares in the hospital; instead, they purchased a hospital 50/50 on a handshake. On paper, Chestatee was 100% owned by DL Florida, which itself was 100% owned by the Debtor; in reality, Chestatee was 50% owned by Ms. Zaffuto.

[1] References to the docket in the Bankruptcy Case are styled as "Bankr. D.E. _"

8. Prior to the acquisition of Chestatee, there was a due diligence call between Ms. Zaffuto, and Ms. Smallwood, the biller for Chestatee. On the call, Ms. Zaffuto asked about the reimbursement rates for Chestatee's laboratory tests but did not ask about reimbursement rates for any other services.

9. Through their acquisition of Chestatee, the Debtor and Ms. Zaffuto inherited an in-network contract with Cigna, the Health System Agreement (the "Agreement"). Soon after the acquisition, the Debtor and Ms. Zaffuto began a fraudulent scheme through which they began to submit large numbers of fraudulent health insurance claims for urine drug testing services to take advantage of the favorable in-network reimbursement rates with Cigna under the Agreement.

10. While the insurance claims were submitted by Chestatee, the tests were performed, if at all, at a different location by Reliance, which was out-of-network with Cigna.

11. Out-of-network providers, such as Reliance, are only entitled to whatever benefits the patient has under the terms of their health benefit plan. Under the Agreement, however, the reimbursement rate for the urine screen tests was 70% of billed charges.

12. Prior to being acquired by Debtor and Ms. Zaffuto, Chestatee charged $200 per test. After the acquisition, Chestatee began to charge $3,500.00 per test, of which $2,450.00 would be reimbursed by Cigna per the terms of the Agreement.

13. After the acquisition of Chestatee, patients were also tested at high frequency and over excessive periods of time. The tests were so frequent that the individual results could not have been reviewed by the clinician prior to collection of the next sample. Every patient received the same tests, without thoughtful selection of drugs being tested for.

14. When Chestatee began receiving requests for medical records from insurance companies, medical records were altered by copying and pasting Chestatee's logo to conceal Reliance's logo on the medical records.

15. Through this scheme, the Debtor and Ms. Zaffuto made substantial amounts of money from private health insurers, such as Cigna, that unwittingly reimbursed for the urine drug tests that were not performed at Chestatee, for individuals that were not patients at Chestatee, charged at an excessive rate, and at an excessive frequency. They directed money from the urine drug test reimbursements to DL Florida, rather than the hospital's operating accounts.

16. The Debtor used the money flowing into DL Florida's accounts for his own personal use. Cigna believes that the proceeds from this scheme include payments to the Debtor of at least $184,407,671.87 (as well as at least $10,902,011.30 to Ms. Zaffuto).

17. Before discovering the fraud scheme, Cigna reimbursed almost $13 million solely for urine drug tests, based on the fraudulent representation that those services had been performed at Chestatee when, in fact, they had not.

18. Following an arbitration hearing under the rules of the American Health Law Association, an arbitrator issued a Final Ruling and Award (attached hereto as **Exhibit A**) on December 1, 2023, in favor of Cigna and against DL Florida for breach of contract, violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), fraud, negligent misrepresentation, unjust enrichment, and conversion.

19. In her determination as to fraud and misrepresentation, the arbitrator found that "documents were altered to make it look as if the tests had been performed at Chestatee . . . to cause [Cigna] to reimburse Chestatee of an unpayable claim."

20. The arbitrator awarded Cigna a total of $20,667,019, consisting of an award of $61,900 in arbitrator compensation and expenses, $1,711,994 in attorney's fees and costs, and $18,893,125 in restitution and prejudgment interest (the "Arbitration Award").

21. The Arbitration Award was confirmed on May 24, 2024[2] and a final judgment entered against DL Florida on June 27, 2024[3] in the United States District Court for the Southern District of Florida (the "District Court") in the case styled *Cigna Healthcare of Georgia, Inc. v. DL Investment Holdings, LLC et al.*, Case No. 23-62393 (S.D. Fla. Dec. 21, 2023). In the same action, Cigna named the Debtor and Ms. Zaffuto as defendants, seeking to hold them liable for the Award under alter ego theories.[4]

22. On June 10, 2024, District Court dismissed Cigna's alter ego claim against the Debtor and Ms. Zaffuto on procedural grounds only. *See* Bankr. D.E. 39, at 6-7. The Court made no substantive decisions with respect to the Debtor's liability to Cigna as an alter ego of DL Investment. As the District Court stated: "Cigna is not without recourse [against Mr. Durall and Ms. Zaffuto]." *Id*. Rather, alter-ego as to the Debtor and Ms. Zaffuto was to be properly argued in proceedings supplementary. *Id.* Indeed, while proceedings supplementary are stayed as to the Debtor as a result of his bankruptcy case, proceedings supplementary are well underway in the District Court against Ms. Zaffuto.

***Misuse of Business Entities***

23. The Debtor formed DL Delaware on October 3, 2006. *See Delaware Secretary of State webpage for DL Delaware as of September 20, 2024* attached hereto as **Exhibit B**. DL

---

2 *See* Objection to Subchapter V Election, Bankr. D.E. 24, Exhibit D.

3 *Cigna Healthcare of Georgia, Inc., v. DL Investment Holdings, LLC, Aaron Durall, and Neisha Zaffuto*, Case No. 23-62393 (S.D. Fla. June 11, 2024) Bankr. D.E. 48.

4 *See* Objection to Subchapter V Election, Bankr. D.E. 24, Exhibit C.

Delaware filed an application to conduct business in Florida as a foreign limited liability company on June 7, 2021, with the Debtor listed as the registered agent, stating an EIN of 81-3577160, and an address of 5389 Nob Hill Rd., Sunrise, Florida 33351. *See Florida Secretary of State Webpage for DL Delaware as of September 20, 2024,* attached hereto as **Exhibit C**. DL Delaware remained an active foreign limited liability company with the Florida Secretary of State until September 27, 2024, due to its failure to file an annual report.

24. The Debtor formed DL Florida on August 3, 2016, (the same month the Debtor and Ms. Zaffuto purchased Chestatee) under the name "Durall Capital Holdings LLC." *See Durall Capital Articles of Organization filed with the Florida Secretary of State,* attached hereto as **Exhibit D**. On December 5, 2016, the Debtor changed the entity's name from Durall Capital Holdings LLC to DL Investment Holdings LLC. *See DL Florida's Name Change filed with the Florida Secretary of State* attached hereto as **Exhibit E**. DL Florida reported the Debtor as its registered agent, stated an EIN of 81-3577160, and an address of 5389 Nob Hill Rd., Sunrise, Florida 33351. The Debtor dissolved DL Florida on June 12, 2024, without leave of this Court, the day after it was served with a subpoena from Cigna.

25. As reported by the Debtor to the Florida Secretary of State, DL Delaware and DL Florida have the same registered agent and the same address and purport to have identical EINs.

26. Meanwhile, the Debtor reported on his Statement of Financial Affairs an entity named "DL Investments" that existed from June 1, 2014 to July 3, 2018 and "DL Investment Holdings LLC" which began June 7, 2021 and continued to exist as of the petition date. SOFA, pg. 7. "DL Investments" reports a mailing address of 5387 North Nob Hill Road, Sunrise, FL 33351 while "DL Investment Holdings LLC" reports a mailing address of 5389 Nob Hill Rd, Fort Lauderdale, FL, 33351. *Id.* Though listed on his petition as two different entities with different

address and different names, the Debtor's Statement of Financial Affairs provides that "DL Investments" and "DL Investment Holdings LLC" maintain the exact same EIN. *Id.*

27. When the Debtor was pressed at the second Section 341 meeting of creditors on August 27, 2024 as to why he listed an entity called "DL Investments" and another entity called "DL Investment Holdings LLC" with the same EIN number in his SOFA, he stated he was not sure why and that they were the same entity, that there was no meaning to various dates of operation listed for the two entities in his SOFA, and he could not say where either was organized. *See* Transcript of August 27, 2024, 341 Meeting attached hereto as **Exhibit F** at 33:11-35:20.

28. The Debtor has not amended his petition to reflect his contention that both "DL Investments" and "DL Investment Holdings LLC" are a single entity, nor has he corrected the EIN number reported for both.

29. Based on information currently available to Cigna, DL Florida acted merely as a pass-through vehicle for the Debtor and Ms. Zaffuto to receive the monies from their insurance reimbursement fraud. Cigna expects to uncover through reasonable discovery that DL Florida transferred funds to DL Delaware disguised as intra-company transfers by masquerading both entities under the same EIN as a means of concealing and insulating funds from the fraud for the Debtor's personal use. Alternatively, Cigna contends that, through discovery, it is likely to find other transferees of funds from the Debtor's fraudulent scheme perpetrated against Cigna (and others).

***Cigna's Proof of Claim***

30. On July 16, 2024, Cigna filed a timely proof of claim in the amount of $21,223,748.81 including the Arbitration Award and $556,729.81 in post-award, pre-judgment interest, plus accruing postjudgment interest (the "Claim").

## NON-DISCHARGEABILITY OF CLAIM

31. Cigna asserts that its Claim against the Debtor arising from the Arbitration Award is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) because it was obtained by false pretenses, false representation, and actual fraud, and § 523(a)(6) because it is for willful and malicious injury to Cigna.

32. Cigna also asserts that the Debtor is personally liable for Arbitration Award because DL Florida and DL Delaware were mere alter egos of the Debtor used to perpetrate fraud on Cigna.

### A. The Claim is Not Dischargeable Under 11 U.S.C. § 523(a)(2)(A)

33. Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge in bankruptcy any debt "for money … to the extent obtained by … false pretenses, a false representation, or actual fraud." Here, Cigna's Claim is non-dischargeable under all three.

#### Count I: False Representation

34. The allegations of paragraphs one (1) through (29) above are repeated and realleged as if fully set forth herein.

35. "A false representation, for purposes of § 523(a)(2), is analogous to a common law fraudulent misrepresentation." *Panjwani v. Khan (In re Khan)*, 652 B.R. 552, 563 (Bankr S.D. Fla. 2023). Under Florida law, a fraudulent misrepresentation claim must satisfy four elements: (1) the defendant made a false statement concerning a material fact; (2) the defendant knew that the representation was false; (3) the defendant intended that the representation induce another to act on it; and (4) the plaintiff was subsequently injured acting in reliance on the representation. *Harris v. Jayo (In re Haris)*, 3 F.4th 1339, 1349 (11th Cir. 2021).

36. Here, the Debtor's conduct satisfies all four elements of a fraudulent misrepresentation claim. First, the Debtor, through his entities, falsely represented to Cigna that

the reimbursement claims submitted to Cigna by Chestatee were for urine tests performed at Chestatee when in reality they were performed, if at all, by Reliance. Second, the Debtor and his co-conspirators knew that the tests were not performed at Chestatee, as evidenced by their active doctoring of Reliance medical records to make it appear as if the records belonged to Chestatee. Third, the Debtor and Ms. Zaffuto intended to use Chestatee's in-network status with Cigna to trick Cigna into reimbursing urine tests that were performed out-of-network at Reliance. This is evidenced by, among other things, Ms. Zaffuto's targeted inquiry into Chestatee's reimbursement rates for laboratory test when acquiring the hospital and her lack of interest reimbursement rates for any other services performed at Chestatee. Fourth, Cigna was injured when it reimbursed Chestatee almost $13 million solely for urine drug tests, based on the fraudulent representation that those services had been performed at Chestatee.

37. Thus, Cigna's Claim against the Debtor is non-dischargeable under § 523(a)(2)(A) because it was obtained by false representation.

**Count II: False Pretenses**

38. The allegations of paragraphs one (1) through (29) above are repeated and realleged as if fully set forth herein.

39. False pretenses refer to "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor." *In re Khan*, 652 B.R. at 563. "False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive." *Taylor v. Wood (In re Wood)*, 245 Fed. Appx. 916, 918 (11th Cir. 2007).

40. Here, the Debtor, in conjunction with Ms. Zaffuto and through his business entities, created a false set of circumstances with the intent to deceive Cigna into reimbursing urine tests that it was not meant to reimburse. Specifically, the Debtor and Ms. Zaffuto caused Chestatee to submit reimbursement claims for tests that were not performed by Chestatee and doctored medical records to make it appear as if the tests were performed by Chestatee. In doing so, the Debtor and Ms. Zaffuto created the false impression that Cigna was under a contractual obligation to reimburse the tests when in fact it was not.

41. Thus, Cigna's Claim against the Debtor is non-dischargeable under § 523(a)(2)(A) because it was obtained by false pretenses.

**Count III: Actual Fraud**

42. The allegations of paragraphs one (1) through (29) above are repeated and realleged as if fully set forth herein.

43. "[A]ctual fraud consists of any deceit, artifice, trick, or design involving the direct and active operation of the mind, used to circumvent and cheat another." *In re Khan*, 652 B.R. at 563. "To prove fraud, a plaintiff must establish the following elements: (i) debtor made a false representation with the intent to deceive plaintiff; (ii) plaintiff relied on the misrepresentation; (iii) plaintiff's reliance was justified; and (iv) plaintiff sustained a loss because of debtor's misrepresentation." *Warren v. Warren (In re Warren)*, 2022 Bankr. LEXIS 3440, *15-16 (Bankr. M.D. Fla. 2022).

44. Here, the Debtor's conduct clearly constitutes actual fraud. First, the Debtor, through his entities, falsely represented to Cigna that the reimbursement claims submitted to Cigna by Chestatee were for urine tests performed at Chestatee when in reality they were performed, if at all, by Reliance. The reimbursement claims falsely submitted by Chestatee were meant to

deceive Cigna into reimbursing for tests that it was under no obligation to reimburse. Second, Cigna relied on the misrepresentation when it reimbursed Chestatee for the urine tests that Chestatee did not perform. Third, Cigna was justified in its reliance where it had a reasonable belief that the reimbursements submitted by Chestatee were true. Fourth, Cigna lost millions of dollars when reimbursed Chestatee for the urine drug tests, based on the fraudulent representation that those services had been performed at Chestatee.

45. Thus, Cigna's Claim against the Debtor is non-dischargeable under § 523(a)(2)(A) because it was obtained by actual fraud.

**B. The Claim is Not Dischargeable Under 11 U.S.C. § 523(a)(6)**

**Count IV: Willful and Malicious Injury**

45. The allegations of paragraphs one (1) through (29) above are repeated and realleged as if fully set forth herein.

46. Section 523(a)(6) of the Bankruptcy Code excepts from discharge debts "for willful and malicious injury by the debtor." "For a debt to be nondischargeable under section 523(a)(6), the debtor must have intended a deliberate or intentional injury." *Carlos v. Howard (In re Howard)*, 653 B.R. 693, 705 (Bankr. S.D. Fla. 2023). "A debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012). "In determining the non-dischargeability of a section 523(a)(6) claim based upon willful and malicious injury, a subjective standard, requiring a creditor to prove that a debtor actually knew that the act was substantially certain to injure the creditor, applies." *In re Howard*, 653 B.R. at 705.

47. Here, the Debtor is responsible for willful and malicious injury to Cigna because he intentionally devised a fraudulent scheme that was substantially certain to injure Cigna. Soon

after their acquisition of Chestatee, the Debtor and Ms. Zaffuto began to submit large numbers of fraudulent health insurance claims for urine drug testing services to take advantage of the favorable in-network reimbursement rates that Chestatee had with Cigna. While the insurance claims were submitted by Chestatee, the tests were performed, if at all, at a different location by Reliance, which was out-of-network with Cigna. As a result of this scheme, Cigna unwittingly reimbursed for the urine drug tests that were not performed at Chestatee, for individuals that were not patients at Chestatee, charged at an excessive rate, and at an excessive frequency. The Debtor knew that submitting the fraudulent reimbursement claims would induce Cigna to reimburse Chestatee for tests it should have not been reimbursed for and consequently cause financial injury to Cigna.

48. Thus, Cigna's Claim against the Debtor is non-dischargeable under § 523(a)(6) because it is a debt for willful and malicious injury by the Debtor to Cigna.

**C. Debtor is Personally Liable for the Arbitration Award**

**Count IV: Alter Ego**

49. The allegations of paragraphs one (1) through (29) above are repeated and realleged as if fully set forth herein.

50. While a business entity may shelter a principal or officer from personal liability under most circumstances, a plaintiff may 'pierce the corporate veil' if they show that the business entity was "formed or used for some illegal, fraudulent or other unjust purpose." *In re Howard*, 653 B.R. at 707. Under Florida law, three factors must be satisfied to pierce the corporate veil:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008).

51. Here, veil piercing is warranted to hold the Debtor liable for the fraud perpetrated through his business entities. First, the Debtor dominated and controlled DL Florida and DL Delaware. Moreover, both DL entities lacked any independent existence from one another, as evidenced by both masquerading under the same EIN. On its face, the scheme appears to be the kind of obfuscation intended to permit the Debtor to funnel the amounts fraudulently obtained through DL Florida to a different entity – DL Delaware – while making such transfers appear to be *intra*-entity transfers when, in fact, they were *inter*-entity transfers. DL Florida acted merely as a pass-through vehicle to receive the monies from the Debtor's insurance reimbursement fraud. The Debtor has also admitted to transferring millions of dollars from the proceeds of DL Florida to related parties for no consideration prior to the petition date.

52. Second, DL Florida, DL Delaware, Chestatee, and Reliance were all used a part of the well-orchestrated fraudulent scheme described above. Chestatee submitted reimbursement claims for tests that were in reality performed by Reliance. The money received from the reimbursement would be transferred to DL Florida and from there to other entities such as DL Delaware for no consideration.

53. Third, the fraudulent use of these entities caused financial injury to Cigna of upwards of $21,223,748.81.

54. Thus, piercing the corporate veil is warranted to hold the Debtor personally liable for the Claim.

## CONCLUSION

WHEREFORE, Cigna respectfully requests that this Court:

(i) Determine that the Debtor is personally liable for the amount owed under the Arbitration Award.

(ii) Order that the Debtor's indebtedness to Cigna constitutes a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(2)(A);

(iii) Order that the Debtor's indebtedness to Cigna constitutes a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(6); and

(iii) Grant Cigna such other and further relief to which Cigna may be justly entitled.

Respectfully submitted this 15th day of October 2024.

By: *Eduardo F. Rodriguez*
**EFR LAWFIRM**
Eduardo F. Rodriguez
800 S. Douglas Road, Suite 350
Coral Gables, Florida 33134
Telephone: (305) 340-0034
eddie@efrlawfirm.com
Florida Bar No. 36423

and

**ALSTON & BIRD LLP**
William S. Sugden (admitted *pro hac vice*)
Kennedy R. Bodnarek (admitted *pro hac vice*)
1201 W Peachtree St NE #4900
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
E-mail: will.sugden@alston.com
kennedy.bodnarek@alston.com

*Attorneys for Cigna Healthcare of Georgia, Inc.*

# EXHIBIT A

**AMERICAN HEALTH LAWYERS ASSOCIATION**
**ALTERNATIVE DISPUTE RESOLUTION SERVICE**

DL INVESTMENT HOLDINGS, LLC
f/k/a DURALL CAPITAL HOLDINGS, LLC
d/b/a CHESTATEE REGIONAL HOSPITAL,

Claimant, CASE NO. 6913

v.

CIGNA HEALTHCARE OF GEORGIA, INC.,

Respondent.
_______________________________________/

**FINAL RULING AND AWARD**

The undersigned Arbitrator was designated in accordance with the Health System Agreement effective on March 1, 2008 (the "2008 HSA"), duly sworn, and have heard the allegations, testimony and other evidence presented at the final hearing which took place at the offices of Alston & Bird in Atlanta, Georgia on August 23-26, 2023, and August 28-30, 2023. Cross-examination of the final witness was conducted by video teleconference on September 15, 2023, and closing arguments were heard via videoconference on September 19, 2023. Appearing for Chestatee Regional Hospital ("Claimant" and "Counterclaim-Respondent") were David DiPietro, Esq. and Lisandra Estevez, Esq. of DiPietro Partners, PLLC. Appearing for Cigna Healthcare of Georgia, Inc. ("Respondent" and "Counterclaimant") were Edward Kang, Esq., Kelsey Kingsbery, Esq. and Ryan Martin-Patterson, Esq. of Alston & Bird. Also present on behalf of the Claimant was Aaron

Durall. After hearing the evidence, reading the transcript, reviewing the briefs of counsel and due deliberation, I do hereby issue the Final Ruling.

## AWARD

1. Claimant's first claim against Respondent, Count I - breach of contract, is **denied**.
2. Claimant's second claim against Respondent, Count II – Violation of O.C.G.A. § 33-24-59.5 is **denied**.
3. Claimant's third claim against Respondent, Count III – Unjust Enrichment is **denied**.
4. Claimant's fourth claim against Respondent, Count IV – Breach of the Covenant of Good Faith and Fair Dealing, is **denied**.
5. Counterclaimant's first counterclaim against Claimant, Count I, Breach of Contract, is **granted**.
6. Counterclaimant's second counterclaim against Claimant, Count II, equitable relief under ERISA, 29 U.S.C. §1132(a)(3) is **granted**.
7. Counterclaimant's third counterclaim against Claimant, Count III, Fraud, is **granted**.
8. Counterclaimant's fourth counterclaim against Claimant, Count IV, Negligent Misrepresentation, is **granted**.
9. Counterclaimant's fifth counterclaim against Claimant, Count V, Unjust Enrichment, is **granted**.

10. Counterclaimant's sixth counterclaim against Claimant, Count VI, Conversion, is **granted**.
11. The Administrative filing and case service fees of the American Health Law Association (AHLA), and the Arbitrator's compensation and expenses, totaling **$61,900.00** shall be borne by Claimant and Counterclaim/Respondent.
12. The Respondents/Counterclaimants are deemed to be the prevailing party in this arbitration proceeding. The Arbitrator determines that the Respondent/Counterclaimant is also entitled to recoup reasonable attorney's fees and reasonable costs, other than those recouped in Paragraph 12 above, in the amount of **$1,711,994.00**.
13. Claimant is ordered to make restitution for the claims payments it has improperly received from Respondent/Counterclaimant, including prejudgment interest, in the amount of **$18,893,125.00.**

## FINDINGS OF FACT

Mr. Durall is a lawyer who practiced personal injury law and general practice until he was approached by his friend Ms. Zaffuto about opening a laboratory business. 45:25, 47:3-6.[1] Ms. Zaffuto was a biller for laboratories, and the laboratory business was profitable after the Affordable Care Act expanded access to substance abuse treatment. 47:10, 47:24. Drug testing is part of a patient's drug addiction treatment. 48:20.

Mr. Durall and Ms. Zaffuto opened Reliance Laboratory in Sunrise, Florida ("Reliance"), in 2014. 47:6. Mr. Marcotte marketed Reliance for 40 percent of revenues

[1] Unless otherwise indicated, all references are to page and line of the transcript.

generated by referrals. 597:21. Mr. Marcotte was on drugs and eventually pled guilty to a crime for which he faces a prison term. 600:25.

Reliance was busy and profitable. 61:21, 62:1. By 2015, Reliance was shipping its overflow to other laboratories for testing, sending the urine samples via FedEx. 62:18, 63:21.

Mr. Durall purchased Chestatee Regional Hospital ("Chestatee") in August 2016 with Ms. Zaffuto who was his 50/50 partner. 91:15, 98:21. Prior to the acquisition there was a due diligence call between Ms. Zaffuto, Ms. Smallwood, the biller for Chestatee, and Stephanie Woods, the Vice President of seller SunLink Health. Ms. Zaffuto asked about reimbursement rates on Chestatee's laboratory tests but not about reimbursement for any other services. 1068:19, 1069:13-21.

By Letter of Intent dated September 30, 2016 (the "LOI"), Chestatee agreed to operate "substantially" under the existing contract. Ex. 3, Ex. 4. The contract that the purchasers inherited was a Health System Agreement, an in-network contract with Cigna, originally signed in March 2008 (the "2008 HSA"). 1368:9-11.

The in-network rate was a big deal. 615:17-25, 616, 617. Out-of-network providers, such as Reliance, are only entitled to whatever benefits the patient has under the terms of their health benefit plan. 1458:9-12. The higher in-network rate is designed to benefit the members that are in a more rural community that has limited access to care. 1058:23, 1059:6, 1059:18. Prior to being acquired by Claimant, Chestatee charged $200 per test, according to Ms. Smallwood, the biller, not $200 per analyte in an 8-panel test, as testified by Mr. Durall. 152:3, 1061:22.

Ms. Zaffuto set the rate to be charged by Chestatee at $3500.00, of which Chestatee was paid 70 percent or $2450.00 per test. 849, 851-852.The contractual payment rate for the urine screen tests was 70% of billed charges. 859:10. Claims for services came in from Texas and Arizona. Ex. 36, 49, 590:22. Reliance referred its overflow to four hospitals, three of which were owned by Mr. Durall. The hospitals billed for the test and Mr. Durall received the profits. 103:13; 106:1; 494:5.

Chestatee had no ability accession a urine test (transfer the urine into an aliquot and barcode it) because the space was too small. 105:11,12; 105:18-21. Reliance accessioned the samples that were forwarded to Chestatee and the other hospitals. 105:24; 106:1. This means that if a sample was sent directly to Chestatee from a provider, it had to be shipped to Reliance to be accessioned before being sent back to Chestatee for testing. This is an interstate trip both ways, and a serious waste of time and resources.

Mr. Durall testified that his main motivation in buying the hospital was to help out the Dahlonega community. 495:11. Nevertheless Claimant made a little over $130 million dollars – on drug testing only - during the twenty-two months Mr. Durall owned Chestatee. 493:18.

Ms. Smallwood saw large deposits being made into Chestatee's bank account shortly after the acquisition, mostly for drug screens as shown by the EOBs. 1076:25, 1078:16-19. Some of the dates of service were for urine screens that were actually run a month before Mr. Durall acquired the hospital. 1080:2. Ms. Smallwood took this up with Mr. Durall, who said it was a mistake; that the tax ID and the NPI of the lab he owned in Florida were mixed up with Chestatee. 1081:21, 1082:1-4. He said Ms. Zaffuto would refund the money to the insurance companies. 1082:17.

Hundreds of thousands of dollars kept coming in so Ms. Smallwood contacted Mr. Durall a second time. He was angry. 1083:25, 1084:1-6. Ms. Zaffuto called her that evening and "told me that I better not go back to Aaron [Durall] again with this if I like my job." 1084:12-15. Ms. Zaffuto revoked Ms. Smalllwood's access to United Community Bank. 1085:5. Her access to QuadX was also partially revoked so she was no longer able to bill for urine screens. 1085:6, 1086:12. From then on, Ms. Zaffuto billed them at her billing company, Medivance. 1086:18, 25. There was no written contract memorializing Ms. Zaffuto's seven and a half million-dollar investment in Chestatee, just a verbal agreement. 906:22.

According to Mr. Durall, tests were ordered with a standing order on file after receipt of a requisition form which identified the test and functioned as an order. 419:25, 420:1-8. After Chestatee was placed on prepayment review in 2017, they added an additional letter of medical necessity that the ordering physician filled out. 172:7, 8. The treatment facilities had a policy of doing three urine screens per patient per week with a standing order that was good for 90 days. 404:22.

The contested claims are denials (nonpayment) of urine screen tests performed on samples that were either sent directly to Chestatee from the ordering provider or reflexed (referred) from Reliance. 165:15. Pallets of boxes of urine were sent to Chestatee which sat in the hall at the hospital because there was no room in the lab. 1089:19. According to Ms. Smallwood, who walked by the lab on her way to and from the business office, all the boxes were shipped to Chestatee from Reliance.1084:8. 1091:1, 5. She does not think they were run and tested at Chestatee's lab. 1091:23, 25. According to Ms. Smallwood, some of the samples were sent back to Reliance without

being opened. 1092:4-5. Lisa Zini was the lab manager. 861:17. (Ms. Zini did not testify at the hearing on this arbitration.) Claims for urine tests were denied as "Services not rendered as billed." 874:7. The FedEx bill for shipping urine samples from Reliance to Chestatee was roughly $60,000 to $70,000 per month for daily shipments. 111:25.

The samples had been collected from patients in several different states who were not inpatients or outpatients of Chestatee. Claims for these nonpatients were documented as Code 141, meaning that the services were not provided to inpatients or outpatients. 143:12, 180:19-23, 235:12-14, Ex. 23, 1461:25. Inpatient and outpatient services are the only services payable under Exhibit C of the 2008 HSA. 1386:25.

In April 2017, Chestatee began receiving requests for medical records from insurance companies. 1093:10. The records were not in Chestatee's possession because the patients were not registered at the hospital. 1093:20,22. Chestatee forwarded the requests to Reliance and asked them to send the records. 1095:2-4. One record that had been requested by a Blue Cross/Blue Shield investigator came from Reliance with a "Reliance Logo" at the top, indicating that the test had been run and resulted by Reliance Laboratories. 1096:9-15. Someone subsequently took the Chestatee logo and copied and pasted it on to the record so that the record would support the claim that the test was run by Chestatee. 1096:24, 1097:2-4. There were other instances in which the same test result appeared with two different logos at the top, which, according to Ms. Smallwood, were altered by Reliance.1099:18. Exhibits 84 and 85 evidence altered medical records. See also 1466-1469.

The chargemaster is the spreadsheet that lists every CPT code and the hospital's charge for each. 1100:15-18. Mr. Durall testified that there was no chargemaster. 656:2,

15. Ms. Smallwood testified that there was and that she handled it. 1100:24, 1101:2. She sent it to Ms. Zaffuto. 1101:2-5. Ms. Zaffuto requested it about November 2016 and commented that lab charges were very low. 1101:4-9. Ms. Smallwood told her she needed to notify the payor of any increased charges. 1101:19-25. In November 2016, Ms. Smallwood filed a federal *qui tam* lawsuit which was dismissed on jurisdictional grounds. 1103:14, 1104:13, 1105:18. She quit working at Chestatee in April of 2017. 1106:3.

Dr. Margaret Jarvis, an expert witness, testified regarding pricing and medical necessity of presumptive drug screens. Just because a physician certifies that a test is medically necessary does not make it so. 1430:7. The payor ultimately determines medical necessity for purposes of payment. 1431:1-19. A urine test typically costs a couple of hundred dollars. Chestatee was charging $3500.00. 1219:9-21. The cost of actually performing a urine drug screen is only a few dollars. 1374:23-24.

For effective treatment of drug dependency, the physician should constantly reassess the appropriateness of testing frequency. 1227:17. In Dr. Jarvis's view, the drug tests that Chestatee was billing to Cigna were not medically necessary. 1347:24. There was absence of individualized testing. 1285:1. The same test was ordered for every patient, with the same frequency over long periods of time. 1253:14-15. The tests were so frequent that the individual results could not have been reviewed by the clinician prior to collection of the next sample. 1255:3. Patients were tested over excessive periods of time. 1255:3. Every patient received the same tests, without thoughtful selection of drugs being tested for. 1258:11-13. "There's a pattern of testing at such frequency that it would have been impossible to use for treatment planning decisions. And this went on without

change over many months, which suggests that there's not an accurate assessment of the patient's severity of illness going on." 1252:2-7.

Cigna administers health benefit plans, most of which are employer sponsored self-funded health benefit plans. 1359 1-4. The money actually paid to the provider comes from a bank account owned by the employer. It is the employer's money, not Cigna's money, that is going to pay the doctor in that situation. 1359:11,12. It is small business plan sponsors whose money is being stolen and used to pay the cost of Chestatee's services and marketing incentives. 1439:12-15.

Cigna would not want a rural hospital such as Chestatee to act as a commercial laboratory because it has no experience operating as a commercial laboratory 1380:21-24. Cigna already has in its network the best commercial laboratories in the country that have years of experience. 1381:1-2. The two that stand out are Quest and Labcorp. 1381:5-6. Quest and Labcorp charged approximately $50 versus the $2450 paid to Chestatee for the same test. 1381:5-15.

There is a contract provision in the Chestatee 2008 HSA that requires the hospital to give advance written notice of charge increases.1370-1372. Chestatee's failure to provide written notice of the charge increase from $200 to $3500 is a material breach of the contract and caused Cigna over $13 million dollars in damages. 1399:23-25, 1400:1.

Section 4.13 of the 2008 HSA excludes services rendered at facilities other than those facilities agreed upon by Cigna. Tests which were run at Reliance would not be covered.1404:21-24. Coverage is excluded because Cigna had contracts with Labcorp and Quest. 1408:1-8.

Overcharging by the Claimant harmed the patients' benefit plans. If a patient had coverage under an employer-sponsored plan administered by Cigna that had a five-thousand-dollar deductible and his urine test was billed by Chestatee for $3500.00, the patient, who could have had a urine screen at Quest for $50, would be responsible for the $3500 if he had not met his five thousand dollar deductible 1411:14-20. This would be devastating to a patient leaving a drug treatment facility. 1412:7, 8.

Cigna's coverage policy for drug testing requires individualized assessment as to whether a particular test is appropriate, and a standing order would fly in the face of Cigna's medical coverage policy. 1432:8-12.

When asked for medical records to support its billing, Chestatee could not provide them. This is a violation of Section 2.11 of the 2008 HSA.

## CONCLUSIONS OF LAW

1. There is no credible evidence that Respondent/Counterclaimant Cigna breached its obligations pursuant to the 2008 HSA and/or the LOA.
2. Chestatee's radical price increase from $200 per test to 70% of $3500.00 was not reported to Cigna. This constitutes a violation of Exhibit C-1 to the HSA.
3. The urine tests at issue were provided to patients in treatment facilities in various states who were not inpatients or outpatients of the hospital. This constitutes a violation of Section 4.1 and Exhibit C-1 to the HSA, which covers only care rendered to inpatients and outpatients of Chestatee.
4. Except for significant marketing incentives, including in-network reimbursement, there is no plausible reason why treatment centers from all over the country would have

shipped urine samples to Chestatee, a tiny hospital in rural Georgia. Such marketing violates Section 4.14 of the HSA.

5. I find it reasonable to conclude that the huge volume of tests billed to Cigna were performed at Reliance, not at Chestatee. The tests were billed to Cigna as if they had been performed at Chestatee although Chestatee kept no records of having performed any such tests. This constitutes a violation of Section 4.13 of the HSA.
6. Some documents were altered to make it look as if the tests had been performed at Chestatee. Such conduct constitutes a falsehood designed to cause the payor to reimburse Chestatee for an unpayable claim. Such conduct constitutes fraud and misrepresentation.
7. The tests were performed pursuant to standing orders and boilerplate statements of medical necessity without regard to individualized care, which is inadequate evidence of medical necessity. Some of the test results were useless and some were not used. Such services do not meet any definition of medical necessity and violate Section 1.8 of the 2008 HSA.
8. Claimant's overcharging for urine tests negatively affected the ERISA plan assets of the patients, in violation of 29 U.S.C. Section 1132(a)(3).
9. I conclude that Claimants used the limited laboratory in a 49-bed hospital in rural Georgia as a vehicle to bill for urine screen tests performed on samples collected in states across the country in order to take advantage of the hospital's in-network contract with Cigna. This arrangement was structured for maximum profit at the expense of any efficiency, cost effectiveness or patient care and materially violates the 2008 HSA in multiple ways, in addition to unjustly enriching the Claimant.

DONE AND ORDERED this 1st day of December, 2023.

Christine C. Whitney, Arbitrator

**CERTIFICATE OF SERVICE**

THE UNDERSIGNED HEREBY CERTIFIES that the foregoing document was electronically filed with the American Health Lawyers Association Web Portal on December 1, 2023 and that copies were served on the following individuals:

| | |
|---|---|
| David Di Pietro, Esq. | david@ddpalaw.com |
| Lisandra Estevez, Esq. | lisandra@ddpalaw.com |
| Laura Brinkman | Paralegal2@ddpalaw.com |
| Edward Kang, Esq. | edward.kang@alston.com |
| Kelsey Kingsbery, Esq. | kelsey.kingsbery@alston.com |
| Ryan Martin-Patterson | ryan.martin-patterson@alston.com |

Christine C. Whitney, Esq.

# EXHIBIT B

**Department of State: Division of Corporations**

Allowable Characters

HOME

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **4229589** | Incorporation Date / Formation Date: | **10/3/2006** (mm/dd/yyyy) |
| Entity Name: | **DL INVESTMENT HOLDINGS LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** | | |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

View Search Results New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

# EXHIBIT C

Department of State / Division of Corporations / Search Records / Search by Entity Name /

# Detail by Entity Name

Foreign Limited Liability Company
DL INVESTMENT HOLDINGS LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | M21000006849 |
| **FEI/EIN Number** | 81-3577160 |
| **Date Filed** | 06/07/2021 |
| **State** | DE |
| **Status** | INACTIVE |
| **Last Event** | REVOKED FOR ANNUAL REPORT |
| **Event Date Filed** | 09/27/2024 |
| **Event Effective Date** | NONE |

**Principal Address**

5389 NOB HILL RD
SUNRISE, FL 33351

**Mailing Address**

5389 NOB HILL RD
SUNRISE, FL 33351

**Registered Agent Name & Address**

DURALL, AARON
5389 NOB HILL RD
SUNRISE, FL 33351

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

MORGAN, STENNETT
7400 NW 5TH PLACE, APT. 207
MARGATE, FL 33063

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2022 | 02/01/2022 |
| 2023 | 03/03/2023 |

**Document Images**

| | |
|---|---|
| 03/03/2023 -- ANNUAL REPORT | View image in PDF format |
| 02/01/2022 -- ANNUAL REPORT | View image in PDF format |
| 06/07/2021 -- Foreign Limited | View image in PDF format |

Florida Department of State, Division of Corporations

# EXHIBIT D

# Detail by Entity Name

Florida Limited Liability Company
DL INVESTMENT HOLDINGS LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L16000145528 |
| **FEI/EIN Number** | 81-3577160 |
| **Date Filed** | 08/03/2016 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 06/12/2024 |
| **Event Effective Date** | NONE |

**Principal Address**

5389 NOB HILL RD
SUNRISE, FL 33351

Changed: 01/17/2020

**Mailing Address**

5389 NOB HILL RD
SUNRISE, FL 33351

Changed: 01/17/2020

**Registered Agent Name & Address**

DURALL, AARON
5389 NOB HILL RD
SUNRISE, FL 33351

Name Changed: 03/12/2018

Address Changed: 01/17/2020

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

DURALL, AARON L
5389 NOB HILL RD
SUNRISE, FL 33351

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2022 | 04/11/2022 |
| 2023 | 02/01/2023 |
| 2024 | 01/31/2024 |

**Document Images**

| | |
|---|---|
| 06/12/2024 -- VOLUNTARY DISSOLUTION | View image in PDF format |
| 01/31/2024 -- ANNUAL REPORT | View image in PDF format |
| 02/01/2023 -- ANNUAL REPORT | View image in PDF format |
| 04/11/2022 -- ANNUAL REPORT | View image in PDF format |
| 03/23/2022 -- LC Revocation of Dissolution | View image in PDF format |
| 01/14/2021 -- VOLUNTARY DISSOLUTION | View image in PDF format |
| 01/13/2021 -- ANNUAL REPORT | View image in PDF format |
| 01/17/2020 -- ANNUAL REPORT | View image in PDF format |
| 11/04/2019 -- CORLCRACHG | View image in PDF format |
| 04/06/2019 -- ANNUAL REPORT | View image in PDF format |
| 03/12/2018 -- CORLCRACHG | View image in PDF format |
| 01/15/2018 -- ANNUAL REPORT | View image in PDF format |
| 01/13/2017 -- ANNUAL REPORT | View image in PDF format |
| 12/05/2016 -- LC Amendment and Name Change | View image in PDF format |
| 08/03/2016 -- Florida Limited Liability | View image in PDF format |

# EXHIBIT E

L16000145528

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP ☐ WAIT ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _______ Certificates of Status _______

Special Instructions to Filing Officer:

Office Use Only

400291980394

12/05/16--01025--013 **25.00

FILED
16 DEC -5 PM 4:22
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

DEC 0 7 2016

Y SULKER

# COVER LETTER

**TO:** **Registration Section**
**Division of Corporations**

**SUBJECT:** DURALL CAPITAL HOLDINGS LLC
Name of Limited Liability Company

The enclosed Articles of Amendment and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

LISANDRA ESTEVEZ
Name of Person

DAVID DI PIETRO & ASSOCIATES, P.A.
Firm/Company

101 NE 3RD AVE, SUITE 1410
Address

FORT LAUDERDALE, FL 33301
City/State and Zip Code

LISANDRA@DDPALAW.COM
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

LISANDRA ESTEVEZ at (954) 712-3070
Name of Person / Area Code / Daytime Telephone Number

*Enclosed is a check for the following amount:*

- ■ $25.00 Filing Fee
- ☐ $30.00 Filing Fee & Certificate of Status
- ☐ $55.00 Filing Fee & Certified Copy (additional copy is enclosed)
- ☐ $60.00 Filing Fee, Certificate of Status & Certified Copy *(additional copy is enclosed)*

**MAILING ADDRESS:**
Registration Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

**STREET/COURIER ADDRESS:**
Registration Section
Division of Corporations
Clifton Building
2661 Executive Center Circle
Tallahassee, FL 32301

# ARTICLES OF AMENDMENT
# TO
# ARTICLES OF ORGANIZATION
# OF

DURALL CAPITAL HOLDINGS LLC
(Name of the Limited Liability Company as it now appears on our records.)
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on 08/03/2016 and assigned Florida document number L16000145528.

This amendment is submitted to amend the following:

**A. If amending name, enter the new name of the limited liability company here:**

DL INVESTMENT HOLDINGS LLC

The new name must be distinguishable and contain the words "Limited Liability Company," the designation "LLC" or the abbreviation "L.L.C."

**Enter new principal offices address, if applicable:** 8411 West Oakland Park Blvd
***(Principal office address MUST BE A STREET ADDRESS)*** Suite 302
Sunrise, FL 33351

**Enter new mailing address, if applicable:** same as above
***(Mailing address MAY BE A POST OFFICE BOX)***

**B. If amending the registered agent and/or registered office address on our records, enter the name of the new registered agent and/or the new registered office address here:**

16 DEC -5 PM 4:24
SECRETARY OF STATE
TALLAHASSEE, FLORIDA
FILED

Name of New Registered Agent: ______________________

New Registered Office Address: ______________________
*Enter Florida street address*

______________________, **Florida** ______________________
*City* *Zip Code*

**New Registered Agent's Signature, if changing Registered Agent:**

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability company has been notified in writing of this change.*

______________________
**If Changing Registered Agent, Signature of New Registered Agent**

**If amending Authorized Person(s) authorized to manage, enter the title, name, and address of each person being added or removed from our records:**

**MGR = Manager**
**AMBR = Authorized Member**

| Title | Name | Address | Type of Action |
|---|---|---|---|
| ______ | ______________________ | ______________________________ | ☐ Add |
| | | ______________________________ | ☐ Remove |
| | | ______________________________ | ☐ Change |
| ______ | ______________________ | ______________________________ | ☐ Add |
| | | ______________________________ | ☐ Remove |
| | | ______________________________ | ☐ Change |
| ______ | ______________________ | ______________________________ | ☐ Add |
| | | ______________________________ | ☐ Remove |
| | | ______________________________ | ☐ Change |
| ______ | ______________________ | ______________________________ | ☐ Add |
| | | ______________________________ | ☐ Remove |
| | | ______________________________ | ☐ Change |
| ______ | ______________________ | ______________________________ | ☐ Add |
| | | ______________________________ | ☐ Remove |
| | | ______________________________ | ☐ Change |
| ______ | ______________________ | ______________________________ | ☐ Add |
| | | ______________________________ | ☐ Remove |
| | | ______________________________ | ☐ Change |

FILED
16 DEC -5 PM 4:22
TALLAHASSEE, FLORIDA

**D. If amending any other information, enter change(s) here:** *(Attach additional sheets, if necessary.)*

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

FILED 16 DEC -5 PM 4:22 SECRETARY OF STATE TALLAHASSEE, FLORIDA

**E. Effective date, if other than the date of filing:** ______________________ **(optional)**

(If an effective date is listed, the date must be specific and cannot be prior to date of filing or more than 90 days after filing.) Pursuant to 605.0207 (3)(b)

<u>Note:</u> *If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the* document's effective date on the Department of State's records.

If the record specifies a delayed effective date, but not an effective time, at 12:01 a.m. on the earlier of:
(b) The 90th day after the record is filed.

Dated November 22, 2016.

______________________________
Signature of a member or authorized representative of a member

AARON DURALL
______________________________
Typed or printed name of signee



**Filing Fee: $25.00**

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 24-14573-smg
Adv. Case No.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of:

AARON DURALL,

Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Office of the United States Trustee
Southern District of Florida
51 S.W. 1st Avenue, Suite 1204
Miami, FL 33130

August 27, 2024

341 Meeting of Creditors

B E F O R E:
MARK P. BARMAT
TRUSTEE

A P P E A R A N C E S :

SCHRAIBERG PAGE PA
Attorney for Debtor Aaron Durall
2385 NW Executive Center Drive #300
Boca Raton, FL 33431

BY: BRADLEY S. SHRAIBERG

FURR COHEN
Attorney for Chapter 7 Trustee Marc P. Barmat
2255 Glades Road, Suite 419A
Boca Raton, FL 33431

BY: ALVIN S. GOLDSTEIN

LSS LAW
Attorney for Vanaz Land Company
2699 Stirling Road C401
Fort Lauderdale, FL 33312

BY: ZACH SHELOMITH

LAW GUARD

Attorney for Vanaz Land Company

P.O. Box 16207

Plantation, FL 33318

BY: MARK RICKARD

NELSON MULLINS

Attorney for Elevance Health

100 S.E. 3rd Avenue, Suite 2700

Fort Lauderdale, FL 33394

BY: SCOTT KNAPP

ALSTON & BIRD

Attorneys for Cigna Health Insurance of Georgia

One Atlantic Center

1201 West Peachtree Street, Suite 4900

Atlanta, GA 30309

By: WILLIAM SUDGEN

KENNEDY BODNAREK

ALSTON & BIRD LLP

Attorneys for Cigna Health Insurance of Georgia

The Atlantic Building

950 F Street, NW

Washington, D.C. 20004

BY: EDWARD "TED" T. KANG

RYAN MARTIN-PATTERSON

SINTON SCOTT MINOCK KEREW

Attorneys for United Health Group

3438 Peachtree Road, Suite 925

Atlanta, GA 30326

BY: SCOTT KEREW

MR. SUGDEN: Yes. This is Will Sugden from Alston & Bird. I have a couple of brief questions. The $50,000 that was paid into BakerHostetler, was that paid before or after you filed for bankruptcy?

MR. DURALL: After.

MR. SUGDEN: Pardon? I didn't hear that.

MR. DURALL: After.

MR. SUGDEN: Has your wife paid retainers to any other law firms?

MR. DURALL: No.

MR. SUGDEN: Did you open -- do you have your statement of financial affairs in front of you? It's Docket Number 1, filed on May 9th?

MR. DURALL: Okay.

MR. SUGDEN: Would you open that to page 40 of 48. I'm focused on the numbers on the top.

MR. DURALL: Okay.

MR. SUGDEN: Question 27 --

MR. DURALL: Yes.

MR. SUGDEN: You see there, there is an entity called DL Investments, at the top, with an address of 5387 North Nob Hill Road. Do you see it?

MR. DURALL: Yes.

MR. SUGDEN: And at the very bottom, there's an entity called DL Investment Holdings LLC, with an address of

5389 Nob Hill Road. Do you see that?
MR. DURALL: Yes. Yes.
MR. SUGDEN: Are those the same entity?
MR. DURALL: They are the same entities. That's where the Reliance Labs was once -- we had both bays.
MR. SUGDEN: And that entity, why did you list it twice?
MR. DURALL: I don't know. It can be consolidated.
MR. SUGDEN: And if you look over on the right, it says date business existed. It has June 1st, 2014 and July 3, 2018 for the DL Investments, the first one. Do you see that?
MR. DURALL: Yes.
MR. SUGDEN: And the one on the bottom, it has date, a single date, June 7th, 2021. Do you see that?
MR. DURALL: I see that.
MR. SUGDEN: And it's still your testimony that those are the same entities?
MR. DURALL: They are the same entity. It's the same Tax ID number.
MR. SUGDEN: Okay. And so, why are they listed separately, and what is the meaning of the date, and the different dates?
MR. DURALL: There's no meaning behind that.

Actually, the dates -- I don't know why the dates are left -- are like that.

MR. SUGDEN: Do you recall your testimony that you have reviewed your schedules and your other filings and that you understood them?

MR. DURALL: Yes.

MR. SUGDEN: Okay. This is an inconsistency. I would like an explanation -- or either an amendment to this, or an explanation, either that, or your prior testimony.

MR. SHRAIBERG: There's no question pending.

MR. DURALL: Do you have a question?

MR. SUGDEN: My next question is, do you have any other entities other than the ones that are listed here?

MR. DURALL: That are active, no.

MR. SUGDEN: Okay. Is DL Investments a Florida entity?

MR. DURALL: I would have to go check the incorporations to answer your question correctly.

MR. SUGDEN: Are there multiple entities named DL Investments?

MR. DURALL: I don't believe so. I only read one company, which was DL Investments. It was previously through Durall Capital Holdings.

MR. SUGDEN: Your testimony is that there's a single entity and a single jurisdiction named DL

Investments, and there are not in fact two entities with identical names in separate jurisdictions. Is that correct?

MR. SHRAIBERG: Objection.

MR. DURALL: Can you rephrase that question? I didn't understand it.

MR. SUGDEN: Is it your testimony that you only have a single entity named DL Investments?

MR. DURALL: That I previously owned, yes.

MR. SUGDEN: And it's also your testimony that you do not have two entities incorporated in different jurisdictions both with the name DL Investments. Correct?

MR. DURALL: Again, I would need to go back and look at the incorporation and see if -- since these entities were incorporated by the attorneys -- to answer that question correctly.

MR. SUGDEN: That is a critical issue here, and you've testified that this is a complete list of your entities. I would like you to check that and communicate with the Chapter 7 Trustee and amend your schedules accordingly.

MR. DURALL: (Indiscernible) --

MR. SUGDEN: Let me ask you this. What -- does DL Investments currently have any bank accounts?

MR. DURALL: No.

MR. SUGDEN: Did it at any time?